# EXHIBIT A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – CHANCERY DIVISION

| | | |
|---|---|---|
| CHARLES B. RICE, SR., CATHERINE B.<br>RICE and BARKSTON PROPERTIES, LLC, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | Case No. 2014CH15973<br>CALENDAR/ROOM 16<br>TIME 00:00<br>Injunction |
| v. | )<br>)<br>) | |
| LSREF3 SAPPHIRE TRUST 2014 and<br>LSREF3 SAPPHIRE, LLC, | )<br>)<br>) | |
| Defendants. | )<br>)<br>) | |

**FILED**
OCT 0 2 2014
DOROTHY BROWN
CIRCUIT COURT

### PLAINTIFFS' VERIFIED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND OTHER RELIEF

Plaintiffs Charles B. Rice, Sr. ("**Mr. Rice**"), Catherine B. Rice ("**Mrs. Rice**") and Barkston Properties, LLC ("**Barkston**" and with Mr. and Mrs. Rice, collectively, the "**Plaintiffs**") by their attorneys Edwards Wildman Palmer LLP, bring this action for breach of contract, preliminary injunctive relief, permanent injunctive relief, declaratory judgment pursuant to 735 ILCS 5/2-701, and other relief against LSREF3 Sapphire Trust 2014 ("**Sapphire Trust**") and LSREF3 Sapphire, LLC ("**Sapphire LLC**" and together with Sapphire Trust, the "**Defendants**"). As and for their Complaint against the Defendants, the Plaintiffs state as follows:

## I.    INTRODUCTION

1.    In Count I, Plaintiffs Mr. and Mrs. Rice seek to enjoin Defendants' unjustified interference with Plaintiffs' efforts to sell their real estate in accordance with that certain valid and binding contract known as the Second Forbearance Agreement, dated January 31, 2012, attached as **Exhibit A** (the "**Forbearance Agreement**"), entered into by and between Plaintiffs

and BMO Harris Bank, N.A. ("**BMO**" or the "**Bank**"). In particular, Mr. and Mrs. Rice seek a preliminary injunction requiring the Defendants to cease interfering with the closing of the sale of the below-described "Sold Property." Mr. and Mrs. Rice also seek a permanent injunction requiring the Defendants to refrain from interfering with the sale of three other parcels of real estate described below as the "Unsold Real Estate".

2.      Pursuant to the Forbearance Agreement, Mr. and Mrs. Rice pledged the Sold Property and the Unsold Real Estate as additional collateral securing the commercial real estate loan (the "**Commercial Real Estate Loan**") restructured under the terms of such Forbearance Agreement.

3.      In Count II, Plaintiff Barkston seeks declaratory relief adjudicating that no default or events of default have occurred in connection with the Commercial Real Estate Loan, and declaring that the purported Notice of Default served by Sapphire LLC is of no force and effect.

II.     **PARTIES**

4.      Plaintiff Mr. Rice maintains his primary residence and domicile in Fulton County, Georgia.

5.      Plaintiff Mrs. Rice maintains her primary residence and domicile in Fulton County, Georgia.

6.      Plaintiff Barkston is a Georgia limited liability company.

7.      Defendant Sapphire LLC is a private equity fund organized as a Delaware limited liability company.

8.      Defendant Sapphire Trust is a Delaware statutory trust.

### III.  **VENUE AND JURISDICTION**

9.      Jurisdiction is proper in this Court pursuant to 735 ILCS 5/2-209 as Defendants transact business within Illinois and the agreements at issue in this case  contain provisions electing the application of Illinois law.

10.     Venue is proper in this Court pursuant to 735 ILCS 5/2-101.  Pursuant to the agreements at issue in this case, courts sitting in Chicago, Illinois have been acknowledged to be an acceptable venue.

<div align="center">

**COUNT I**
**(Breach of Contract)**
**Mr. and Mrs. Rice Claiming Against All Defendants**

</div>

11.     On or about October 24, 2006, in connection with the Commercial Real Estate Loan, Barkston as the borrower entered into that certain Term Loan Agreement (the "**Loan Agreement**") and that certain Term Loan Note (the "**Note**") with the Bank.  Concurrently, on or about October 24, 2006, Mr. & Mrs. Rice as the guarantors entered into that certain Guaranty Agreement (the "**Guaranty**", and together with the Loan Agreement and the Note, the "**2006 Barkston Loan Documents**") with the Bank. (**Group Exhibit B**).

12.     On or about January 31, 2012, after the Bank claimed alleged defaults under the 2006 Barkston Loan Documents, and after filing suit on the Guaranty, Plaintiffs and the Bank entered into the Forbearance Agreement.  Pursuant to that Forbearance Agreement, and among other things, the Bank agreed to forbear from exercising its rights and remedies under the 2006 Barkston Loan Documents in regards to any Existing Defaults and any Potential Unclaimed Defaults (all as defined and described in the Forbearance Agreement).  Pursuant to paragraph 7 of the Forbearance Agreement, certain real estate, defined as the "**Additional Collateral**", was

<div align="center">

3

</div>

provided as additional collateral for this Commercial Real Estate Loan. The Additional Collateral was comprised of the Sold Property and the Unsold Real Estate, and included:

(a)     9090 Barkston Drive, Alpharetta, Georgia, a property included in the Unsold Real Estate;

(b)     3965 Golf Drive, Conover, North Carolina, a property included in the Unsold Real Estate;

(c)     46 Surfson Road, Kiawah, South Carolina, the Sold Property; and

(d)     vacant land in Highlands, North Carolina, a property included in the Unsold Real Estate.

13.     Paragraphs 8 and 9 of the Forbearance Agreement, respectively entitled "Sale of Additional Collateral" and "Property Sales Efforts," specifically contemplate that Mr. and Mrs. Rice have the exclusive right to sell any or all of the "Additional Collateral," and that Plaintiffs would make diligent efforts to sell the properties listed as Additional Collateral. **Exhibit A,** ¶¶ 8, 9. Paragraphs 8 and 9 state the following:

8.      *Sale of Additional Collateral.* Should any of the Additional Collateral be sold at any time during the Standstill Period, Borrower and/or Guarantors shall pay to the Bank or cause the titled owners of the Additional Collateral to pay to the Bank, 90% of the Net Sales Proceeds. For purposes of this Agreement, *"Net Sales Proceeds"* means the purchase price payable to Borrower, Guarantors or the titled owner(s) of the Additional Collateral at closing, less the commissions, property taxes (including prorations), repair/maintenance expenses that Seller is required by the sales contract to pay or reimburse at closing, and customary closing costs, including expenses for title examinations, survey, title insurance premiums, and any other expenses customarily paid by a seller in the jurisdiction where the property being sold is located. The Net Sale Proceeds received by the Bank shall be applied ratably based on amount of principal outstanding) to the balance then due under the Loan Documents and the balance then due under the loan documents between Ringo's Ridge, LLC and the Bank.

9.      *Property Sales Efforts.* During the Standstill Period, Borrower and Guarantors shall provide the Bank with all necessary and reasonable cooperation in the Bank's continuing due diligence on the Property and Additional Collateral including, but not limited to, providing access upon demand from the bank to the Property and Additional

Collateral for purposes of appraisals, and Borrower and Guarantors shall provide the Bank with bi-annual (June 1 and December 31 of each year during the Standstill Period) updates of all sales efforts for the Property and Additional Collateral, if any, which updates shall include, but shall not be limited to, production of documentary evidence of (a) current status of listing prices or any adjustments thereof, (b) any offers or counteroffers or letters of intent to acquire the Property or Additional Collateral, (c) marketing plans from any of the listing agents for the Property or Additional Collateral, (d) updated strategy to increase buyer-interest in the Property or Additional Collateral should market offers and or interest not be forthcoming or below expectations, and (e) any discussion of market-based events that could have an effect (either positively or negatively) the sale of the Property or Additional Collateral.

14.     Mr. and Mrs. Rice's right to sell the Additional Collateral under the Forbearance Agreement is clear and express, the Forbearance Agreement does not require the Bank to provide prior consent and there are no conditions, limitations or prohibitions governing the sale of any of the four pieces of Additional Collateral. In particular, the Forbearance Agreement does not give the Bank any right to veto or block the sale of the Additional Collateral, and likewise does not contain any requirements as to a minimum price that must be received in connection with such transaction.

15.     Mr. and Mrs. Rice spent years diligently trying to sell the Sold Property, during which time Plaintiffs received only one offer for this property. That offer, received in August 2014, was made in an amount in excess of the current appraised value of the Sold Property.

16.     Mr. and Mrs. Rice, consistent with their rights under the Forbearance Agreement, accepted this offer and entered into that certain valid and enforceable contract for the sale of the Sold Property dated August 6, 2014 (the "**Sales Contract**", attached along with the Notice of Sale as part of **Exhibit C**). The closing of that transaction is currently scheduled for October 30, 2014. The closing was initially scheduled for September 30, 2014, but was extended because, as a result of the Defendants' conduct described herein, the closing could not go forward on that date.

5

17.     Upon information and belief, the Sold Property, however, is purportedly subject to four (4) recorded instruments, all originally made in favor of the Bank and on information and belief later assigned to one or more of the Defendants, as detailed below:

(a)     That certain Mortgage recorded at Book 343, Page 873 and dated June 28, 2013 ("**Mortgage 1**"), which on information and belief was assigned by the Bank to Sapphire LLC with such assignment recorded on July 25, 2014, at Book 419, Page 79, and further assigned by Sapphire LLC to Sapphire Trust with such assignment recorded on July 25, 2014, at Book 419, Page 84;

(b)     That certain Mortgage recorded at Book 360, Page 570 and dated June 28, 2013 ("**Mortgage 2**"), which on information and belief was assigned by the Bank to Sapphire LLC with such assignment recorded on July 25, 2014, at Book 419, Page 77, and further assigned by Sapphire LLC to Sapphire Trust with such assignment recorded on July 25, 2014, at Book 419, Page 81;

(c)     That certain Assignment of Leases and Rents recorded at Book 343, Page 874 and dated June 28, 2013 ("**Assignment of Rents and Leases 1**"), which on information and belief was assigned by the Bank to Sapphire LLC with such assignment recorded on July 25, 2014, at Book 419, Page 80, and further assigned by Sapphire LLC to Sapphire Trust with such assignment recorded on July 25, 2014, at Book 419, Page 85; and

(d)     That certain Assignment of Leases and Rents recorded at Book 360, Page 571 and dated June 28, 2013 ("**Assignment of Rents and Leases 2**"),

which on information and belief was assigned by the Bank to Sapphire LLC with such assignment recorded on July 25, 2014, at Book 419, Page 78, and further assigned by Sapphire LLC to Sapphire Trust with such assignment recorded on July 25, 2014, at Book 419, Page 82.

18.     As of the present date, and on further information and belief, the Sapphire Trust still holds these instruments and related agreements pertaining to the Commercial Real Estate Loan, including the 2006 Barkston Loan Documents and the Guaranty of Mr. and Mrs. Rice.

19.     On August 26, 2014, Mr. and Mrs. Rice tendered to Sapphire LLC a notice of sale for the Sold Property (the "**Notice of Sale**", attached as **Exhibit C**). Another copy of the Notice of Sale was tendered to the Sapphire Trust, dated on September 16, 2014 (attached as **Exhibit D**), with receipt acknowledged by its counsel on September 22, 2014.     By these notices, Mr. and Mrs. Rice made timely and effective demand for the Defendants to comply with their obligations under the Forbearance Agreement, and to deliver the documentation needed to close the Sale Contract.

20.     Defendants, while fully aware of the provisions in the Forbearance Agreement contemplating sale of the Additional Collateral, have nonetheless refused to confirm that each will deliver the required release documents in proper format and properly executed and notarized, such that Mortgage 1, Mortgage 2, the Assignments of Rents and Leases 1, and the Assignment of Rents and Leases 2 can be released, and the closing of the Sales Contract can occur.

21.     To the contrary, the Defendants have taken the position that they need not release any of these instruments until the Commercial Real Estate Loan has been paid in full, or until payments have been received in an amount far exceeding what is required under the Forbearance

Agreement. The Defendants have also demanded, as a condition of releasing these instruments, that the period of forbearance provided under the Forbearance Agreement be shortened. The transaction contemplated by the Sales Contract cannot be closed without such third-party release instruments.

22.     Mr. and Mrs. Rice and the purchaser are ready, willing and able to close the transaction contemplated by the Sales Contract. All contingencies to closing have been satisfied, and the only missing documents are the release instruments to be executed by the Defendants. As a result of the Defendants' position, the original closing date of September 30, 2014 had to be postponed, and a new and extended closing date of October 30, 2014 has been set.

23.     Defendants are already obligated under the Forbearance Agreement to cooperate with effectuating the Sales Contract and to provide customary release instruments, yet have knowingly disregarded and continue to disregard the terms of the Forbearance Agreement. Instead of complying with the obligations of the Forbearance Agreement, the Defendants have willfully sought to block the closing of the Sales Contract, and have tried to extract additional concessions from the Plaintiffs before such closing can occur.

24.     Mr. and Mrs. Rice have a protectable right under the Forbearance Agreement to complete the sale of the Sold Property in the manner contemplated in the Sales Contract.

25.     The only right of the Bank and its assignee(s) in connection with a sale of any of the "Additional Collateral" is to receive 90% of the Net Sales Proceeds actually received by Mr. and Mrs. Rice as defined in the Forbearance Agreement, and to approve certain "expenses and closing items"as detailed in paragraph 8 of the Forbearance Agreement.

26.     Mr. and Mrs. Rice have provided by letter dated September 16, 2014, a draft HUD Closing Statement requesting approval of the expected "expenses and closing items." The

expenses and closing items reflected in the Closing Statement are reasonable and customary. Counsel for the Defendants acknowledged receipt of this letter and exhibits on September 22, 2014. The Defendants have declined to approve or reject any of these expenses and closing items, and indeed have made no response whatsoever on this point.

27.     Mr. and Mrs. Rice have been and continue to be ready, willing and able to pay the required 90% of the "Net Sales Proceeds" to the holder of this Commercial Real Estate Loan, or to remit these funds into escrow pending further court order, which as provided in Paragraph 8 is to be "applied ratably" to the balance on this loan.

28.     Real Estate is unique as a matter of law. If Mr. and Mrs. Rice are unable to carry out the Sales Contract, they will suffer irreparable harm in relation to their real property rights, even though the Plaintiffs are in full compliance with their obligations under the Forbearance Agreement and otherwise in connection with this Commercial Real Estate Loan. Mr. and Mrs. Rice have no adequate remedy at law for this infringement of their real property rights.

29.     While Plaintiffs are likely ultimately to succeed on the merits of their claims, their ability to effectuate the Sales Contract will be eliminated absent immediate injunctive relief by this Court.

30.     Plaintiffs seek a preliminary injunction prohibiting Defendants from unlawfully interfering with the Sales Contract.

31.     Plaintiffs further seek a permanent injunction prohibiting Defendants from likewise unlawfully interfering with any future sales of any of the other Additional Collateral under the Forbearance Agreement.

**The Sold Property, Appraisal, Sales Contract, and Notice of Sale**

32.     The Sold Property consists of a unique waterfront home on the beach of Kiawah Island, South Carolina, purchased in 2002 for about $7.5 million.

33.     There are few comparable properties and a slow turnover of properties in neighboring areas, thus making accurate market valuation difficult.

34.     Between the time of purchase and Mr. and Mrs. Rice's eventual resale attempts in 2011, a housing boom, bust, and moderate recovery occurred in the American housing market, thus further complicating the process of accurate market valuation.

35.     Mr. and Mrs. Rice listed the Property for sale in November of 2011 for approximately $7,975,000.

36.     Plaintiffs reduced the asking price of the Sold Property in December of 2011 to approximately $7,775,000.

37.     Plaintiffs again reduced the asking price of the Sold Property in June of 2012 to approximately $7,050,000.

38.     Plaintiffs again reduced the asking price of the Sold Property in November of 2012 to approximately $5,900,000.

39.     Plaintiffs finally reduced the asking price of the Sold Property in July of 2014 to $5,700,000.

40.     On or about August 4, 2014, Island Life Investments, LLC (the "**Buyer**") made an offer (the "**Initial Offer**") to purchase the Sold Property for $4,800,000.

41.     This Initial Offer was the first offer on the Sold Property since the purchase in 2002.

42.     Nonetheless, Mr. and Mrs. Rice diligently negotiated the Initial Offer upwards to $5,200,000 (the "**Final Offer**").

43.     Mr. and Mrs. Rice accepted this Final Offer and entered into the Sales Contract.

44.     According to the appraisal of the Property (the "**Appraisal**", attached to the Notice of Sale in **Exhibit C**), the value of the Property as of August 11, 2014, was $4,950,000.

45.     The Final Offer value exceeds the Appraisal value by a quarter of a million dollars.

46.     On August 26, 2014, Mr. and Mrs. Rice sent their Notice of Sale, attaching the Sales Contract and Appraisal to the same, and requesting customary assurances.

### Defendants' Deliberate Interference with the Sales Contract

47.     Despite knowing of the history of the Sold Property, the sales efforts of Plaintiffs, the rights of Mr. and Mrs. Rice to sell the Sold Property, the Appraisal value of the Property, and the existence of a valid Sales Contract $250,000 in excess of this Appraisal value and Defendants' own internal appraisals and information, Defendants indicated that they will not cooperate with the sale as required under the Forbearance Agreement for anything less than an additional $2,000,000+ in premature payments and/or an earlier end to the Standstill Period under the Forbearance Agreement.

48.     Defendants are aware that Plaintiffs are under time pressure and that time is of the essence in effectuating the closing of the Sales Contract.

49.     Defendants know of their interference and willfully intend to commit such interference, as they seek leverage to demand funds and concessions for which there is no right.

11

**Preliminary Injunction**

50.     Defendants have and continue to wrongfully encumber the Property and have interfered and attempted to interfere with Plaintiffs' sale of the Sold Property.

51.     The Forbearance Agreement unambiguously and clearly establishes Mr. and Mrs. Rice's protectable right to freely sell the Sold Property without prior approval.

52.     The Forbearance Agreement necessarily forbids Defendants from interfering with Mr. and Mrs. Rice's sales efforts in regards to the Sold Property, including by failing to provide the customary release instruments.

53.     Defendants know of Plaintiffs' valid Sales Contract for sale of the Sold Property and yet continue to willfully and wrongfully interfere with the same.

54.     The Sales Contract involves real property and as a matter of law, real estate is deemed unique.

55.     Unless Defendants are enjoined from interfering with the Sales Contract, Mr. and Mrs. Rice will suffer irreparable injury. Among other things, Plaintiffs will be unable to close on the Sales Contract and will be forced to endure risks until such unknown time as they are able to effectuate a sale. No adequate remedy at law is available.

56.     Plaintiffs' rights are clearly established under the Forbearance Agreement and Mr. and Mrs. Rice enjoy a high likelihood of success on the merits on final adjudication.

57.     Issuance of injunctive relief will maintain the *status quo* between the parties; namely, transferring the lien of the Defendant(s) to 90% of the "Net Sales Process" through an escrow arrangement pending further court order.

58.     The harm to Plaintiffs in the absence of an injunction is immediate and great, whereas the harm to Defendants from an injunction, if any, is non-existent.

WHEREFORE, Plaintiffs move this Court for the following injunctive relief:

A.     The issuance of a Preliminary Injunction, enjoining the Defendants and their employees, agents, successors, and assigns, from:

(a)     interfering, directly or indirectly, with the Sales Contract;

(b)     failing to release any liens with respect to such Sold Property upon Mr. and Mrs. Rice's tender of proceeds in the manner contemplated under the Forbearance Agreement or into an escrow subject to further court order;

(c)     failing to otherwise make reasonable efforts to facilitate the Sales Contract and comply with the spirit and intent of any Order of this Court; and

(d)     taking or failing to take any further actions as the Court shall deem just and proper.

B.     The issuance of a Permanent Injunction enjoining the Defendants and their employees, agents, successors, and assigns, from:

(a)     interfering with sales of the other Additional Collateral, or otherwise refusing to issue customary assurances to any buyers of Additional Collateral;

(b)     failing to release any liens with respect to such Additional Collateral upon Plaintiffs' tender of proceeds from the sale of such Additional Collateral in the manner contemplated under the Forbearance Agreement or into escrow pending further court order;

(c)     refusing to otherwise comply with the terms of the Forbearance Agreement in respect to the Additional Collateral;

<div align="center">13</div>

(d)     failing to otherwise make reasonable efforts to facilitate sales of Additional Collateral and to comply with the spirit and intent of the order of this Court; and

(e)     taking or failing to take any further actions as the Court shall deem just and proper.

## COUNT II
### (Declaratory Judgment)
### Plaintiff Barkston Against Sapphire LLC and Sapphire Trust

59.     Plaintiffs repeat and reallege the preceding paragraphs 1 through 58 as if fully set forth herein.

### Wrongful Notice of Default

60.     Sapphire LLC – which upon information and belief, had already assigned all its purported rights in this Commercial Real Estate Loan and related agreements to the Sapphire Trust—issued a default notice to Barkston (the "**Default Notice**"), dated September 3, 2014 (**Exhibit E**). Barkston responded by letter dated September 12, 2014 (**Exhibit F**).

61.     This Default Notice claimed defaults on two grounds, both of which are wrongful, made in bad faith and in breach of the Forbearance Agreement.

62.     The Default Notice claimed default on grounds of Barkston not maintaining at least $10,000,000 in liquid assets as required by the Term Loan (the "**First Alleged Default**").

63.     Pursuant to the Forbearance Agreement, the First Alleged Default is an Existing Default (as defined in the Forbearance Agreement), is subject to the Defendants' continuing obligation to forbear, and cannot serve as a new basis for default. By contending otherwise, and purporting to issue the Default Notice, Sapphire LLC breaches the obligations of the Forbearance Agreement.

64.     Defendants knew or should know of the contents of the Forbearance Agreement and the corresponding forbearance required on any default based on liquid asset requirements.

65.     As such, the First Alleged Default was alleged in willful defiance of the Forbearance Agreement, with such gross negligence as to reflect a wanton disregard of the rights bestowed upon Plaintiffs under the Forbearance Agreement and in breach of the Forbearance Agreement.

66.     The Default Notice also claimed default based on purported "gross misrepresentations pertaining to the valuation of the Sold Property (the "**Second Alleged Default**"). The response letter of September 12, 2014 also explained why the Second Alleged Default was without any legal basis.

67.     The Default Notice did not identify any specific factual basis for this Second Alleged Default.

68.     The only potential representations made by Plaintiffs concerning the value of the Sold Property come from the Sales Contract, the independent Appraisal, or the personal financial statements of Plaintiffs. None of these valuations can be construed as misrepresentations.

69.     The actual market price achieved in an arms-length transaction such as the Sales Contract is, by definition, an accurate representation of the market valuation, and the communication of such actual market price cannot constitute a misrepresentation.

70.     The estimated market price as measured by a professional appraiser such as given in the Appraisal represents that professional's best opinion as to the actual market value of a property, and the truthful communication of such an opinion cannot constitute a misrepresentation.

71.     Further, consistent with their obligations under the Forbearance Agreement, Plaintiffs have disclosed on a timely basis all asking prices, offers, and other relevant sales information concerning the Sold Property.

72.     Moreover, on information and belief, the Bank and/or Defendants ordered their own appraisals of the Property and thereby knew what it was worth, such that they cannot credibly claim to be in any way misled as to the value of the Sold Property. Defendants asserted their Second Alleged Default without disclosing their possession of any such appraisals of the Sold Property or any other information under their control concerning estimates of the market value of the Sold Property.

73.     The Second Alleged Default was further made while concealing the fact that Defendants were well aware of the fair market value of the Sold Property at all relevant times through their own appraisal efforts and thus could not be even harmed by any purported misrepresentations.

74.     Finally, upon information and belief, the Default Notice came from Sapphire LLC well after it had already purportedly assigned whatever rights it had to the Sapphire Trust. As such, the Default Notice came from an entity without power to issue it, and thus is inherently void and without power.

75.     An actual controversy exists between the Barkston and these Defendants regarding whether proper notice of default has been given in connection with this Commercial Real Estate Loan.

WHEREFORE, Plaintiff Barkston pray that this Court:

(a)     enter preliminary and permanent injunction barring any enforcement of the Default Notice during the pendency of this suit;

16

(b)    determine and adjudicate the rights of the parties with respect to the Default Notice;

(c)    find and declare that the Default Notice is null and void; and

(d)    grant to Plaintiffs such other relief as this Court deems proper.

Date: October 2, 2014

Respectfully submitted,

One of the Attorneys for Plaintiffs

Jonathan W. Young
Thomas I. Matyas
EDWARDS WILDMAN PALMER LLP
225 West Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 201-2000
Firm No. 48791

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure of Illinois, the undersigned certify that the statements set forth in the attached PLAINTIFFS' VERIFIED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND OTHER RELIEF are true and correct except as to matters therein stated to be on information and belief, and in such matters, the undersigned certifies that they verily believes the same to be true.

_____
Charles B. Rice, Sr.

_____
Catherine B. Rice

BARKSTON PROPERTIES, LLC

By: _____

Its: _MANAGER_

# EXHIBIT A

### SECOND FORBEARANCE AGREEMENT

This Second Forbearance Agreement (*"Agreement"*) is made effective as of January 31, 2012 by and among BARKSTON PROPERTIES, LLC (*"Borrower"*) and CHARLES B. RICE, SR. and CATHERINE B. RICE (collectively, *"Guarantors"*) on the one hand, and BMO HARRIS BANK N.A. f/k/a Harris N.A. (the *"Bank"*), on the other hand.

### R E C I T A L S :

A.     The Bank previously extended credit to Borrower on the terms and conditions set forth in that certain: (1) Term Loan Agreement dated October 24, 2006, in the original principal amount of $9,400,000.00, and all amendments and modifications thereof; (2) Term Loan Note dated October 24, 2006, in the original principal amount of $9,400,000.00; (3) Deed to Secure Debt and Security Agreement with Assignment of Rents dated October 24, 2006 on the property located at 9110 Barkston Drive, Alpharetta, Georgia (the *"Property"*); and (4) Guaranty Agreement dated October 24, 2006, executed by Guarantors, in favor of the Bank, personally guaranteeing all debt owed the Bank by Borrower (with all of the foregoing loan documents, and any related loan documents executed in connection therewith, collectively referred to below as the *"Loan Documents"*). All capitalized terms used below without definition shall have the meanings ascribed to such terms in the Loan Documents.

B.     As of the date hereof, Borrower is in default under the Loan Documents by virtue of, among other things, Borrower's failure to comply with certain covenants contained therein at varying times since the execution of the Loan Documents and continuing through the date of execution of this Agreement, as well as to make payment in full under the Loan Documents on or before the January 31, 2012 maturity date (collectively, the *"Existing Default"*).

C.     The Bank is not willing to waive the Existing Default.

D.     The Bank has commenced foreclosure proceedings on the Property in Georgia (the *"Foreclosure"*) and has filed a Complaint in the United States District Court for the Northern District of Illinois against the Guarantors titled *BMO Harris Bank N.A. v. Charles B. Rice, et al.*, Case No. 12 C 7041 (the *"Lawsuit"*).

E.     Borrower and Guarantors have requested that the Bank cancel the Foreclosure, dismiss the Lawsuit and temporarily forbear from exercising its rights and remedies under the Loan Documents by virtue of the Existing Default pursuant to the terms of this Agreement.

F.     In order to accommodate Borrower's and Guarantors' request, during and only during the period (the *"Standstill Period"*) beginning on the date of this Agreement and ending on June 28, 2020 (the *"Scheduled Standstill Expiration Date"*), the Bank is willing to temporarily forbear from exercising its rights and remedies available by reason of the Existing Default on the terms, conditions, and provisions contained in this Agreement.

NOW, THEREFORE, for good and valuable consideration (including but not limited to the provision of additional collateral to secure the amounts owing under the Loan Documents and the releases provided hereunder), the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.     *Incorporation of Recitals; Defined Terms.* Borrower and Guarantors acknowledge that the Recitals set forth above are true and correct in all material respects. The defined terms in the Recitals set forth above are hereby incorporated into this Agreement by reference. All other capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Loan Documents.

2.     *Amounts Owing.* Borrower and Guarantors acknowledge and agree that the total amounts due and owing under the Loan Documents as of June 28, 2013 are as follows:

| | |
|---|---|
| Principal | $ 8,398,769.64 |
| Interest | $   329,926.40 |
| Per Diem | $     1,224.82 |

and all such amounts (together with accrued and further accruing interest, late charges, costs and attorneys' fees) are justly and truly owing by Borrower and Guarantors to the Bank without defense, offset or counterclaim.

3.     *Acknowledgment of Default.* The Existing Default constitutes an Event of Default under the Loan Documents. Borrower and Guarantors acknowledge that, because of the Existing Default, the Bank is permitted and entitled under the Loan Documents to exercise any other rights or remedies that may be available under the Loan Documents or under applicable law. Borrower and Guarantors represent to the Bank that there are no Defaults or Events of Default other than the Existing Default (or known occurrences which, without or without the giving of notice and passage of time, would constitute a Default or Events of Default) and the potential for present and future breaches under the following provisions of the Loan Documents: (i) the maturity provision and payment schedule provided under the Promissory Note and Term Loan Agreement, (ii) the default rights under the Guaranty Agreement based upon the claimed insolvency of the Borrower or Guarantors (based on the current financial condition of the Borrower or Guarantors disclosed to the Bank), as set forth in ¶7 of the Guaranty Agreement, (iii) the requirements under ¶9 of the Guaranty Agreement governing the required levels of liquid assets and debt for the Guarantors (based on the current financial condition of the Borrower or Guarantors), as well as the timing of the Guarantors' tax returns, (iv) the requirement under the Term Loan Agreement that construction be completed by a date certain, (v) the material adverse change covenants set forth in the Term Loan Agreement, (vi) the provisions of ¶¶6.9, 8.8 and 9.1 of the term Loan Agreement and (vii) any representation or warranty that the Bank will hold a perfected, first priority security interest on the Additional Collateral (as hereinafter defined) to be provided hereunder (the "Potential Unclaimed Defaults"). Notwithstanding the foregoing, should any of the following events occur following the Effective Date of this Agreement, such events shall *not* be deemed either an Existing Default or a Potential Unclaimed Default, and may be declared a new Event of Default to the extent permitted under the Loan Documents: (i) the death of the Guarantors, (ii) the filing of a petition for relief under title 11, United States Code,

2

by or against either of the Borrower or the Guarantors, (iii) the commencement of litigation by a party other than the Bank against either of the Borrower or the Guarantors, with such litigation remaining undismissed sixty days after filing, and with the relevant pleading requesting either (A) money damages of $250,000 or greater, (B) the imposition of a new lien on the Property or Additional Collateral, or (C) the foreclosure of an existing lien on the Property or Additional Collateral and (iv) the insolvency of the Guarantors, based upon changes, subsequent to the Effective Date, to the assets and liabilities of the Guarantors as disclosed to the Bank.

4.    *Payments During Standstill Period.*  Borrower shall make monthly principal and interest payments based on the amortization schedule attached hereto and made a part hereof as Exhibit A, at an interest rate of 2.25% (the *"Amortization Schedule"*), effective June 28, 2013. The first monthly payment shall be July 15, 2013 and all payments thereafter will be due on the fifteenth day of each calendar month. The full payment of all amounts reflected as owing under the Amortization Schedule shall satisfy all obligations under the Promissory Note, Guaranty Agreement and Term Loan Agreement, other than any accrued interest, intervening fees and costs that have accrued prior to such payment or the expiration of the Amortization Schedule.

In consideration of the Borrower's and Guarantors' full and timely performance of their obligations set forth herein, the Bank agrees to forbear from exercising its rights and remedies available under the Loan Documents by reason of the Existing Default or the Potential Unclaimed Defaults.

5.    *Principal Paydowns.*  On or before June 28, 2013, Borrower shall pay to the Bank $1,000,000.00 to be applied to the principal balance due under the Loan Documents. Then, prior to June 30 of each year during the Standstill Period commencing in 2014, Borrower shall pay to the Bank $500,000.00 per year to be applied to the principal balance due under the Loan Documents (the *"Principal Paydown Payments"*).

6.    *Payment of Past Due Amounts and the Bank's Expenses.*  Within 120 days of the execution of this Agreement, Borrower and Guarantors shall pay to the Bank all past due accrued interest (to June 28, 2013) due under the Loan Documents in the amount of $329,926.40 (the *"Accrued Interest"*). On or before June 28, 2013, Borrower and Guarantors shall pay to the Bank all of Bank's costs and expenses, including attorney's fees, incurred to date in the amount of $58,624.25 (the *"Accrued Attorneys' Fees"*). The payment of the Accrued Interest and the Accrued Attorneys' Fees shall satisfy all past due amounts presently owing to the Bank under the Loan Documents, other than those amounts reflected on the Amortization Schedule.

7.    *Pledge of Additional Collateral.*  Contemporaneously with the execution of this Agreement, Borrower and/or Guarantors shall execute or shall cause the titled owners of the following properties to execute, any and all necessary documentation so that the Loan Documents are further secured by security interests in favor of the Bank in the following properties:

      a.    9090 Barkston Drive, Alpharetta, Georgia;

      b.    3965 Golf Drive, Conover, North Carolina;

    c.    46 Surfsong Road, Kiawah, South Carolina; and

    d.    vacant land in Highlands, North Carolina.

(these properties shall hereinafter be referred to collectively as the *"Additional Collateral"*).

    8.    *Sale of Additional Collateral.* Should any of the Additional Collateral be sold at any time during the Standstill Period, Borrower and/or Guarantors shall pay to the Bank or cause the titled owners of the Additional Collateral to pay to the Bank, 90% of the Net Sales Proceeds. For purposes of this Agreement, *"Net Sales Proceeds"* means the purchase price payable to Borrower, Guarantors or the titled owner(s) of the Additional Collateral at closing, less the following expenses and closing items subject to approval by the Bank: transfer tax, real estate commissions, property taxes (including prorations), repair/maintenance expenses that Seller is required by the sales contract to pay or reimburse at closing, and customary closing costs, including expenses for title examinations, survey, title insurance premiums, and any other expenses customarily paid by a seller in the jurisdiction where the property being sold is located. The Net Sale Proceeds received by the Bank shall be applied ratably (based on amount of principal outstanding) to the balance then due under the Loan Documents and the balance then due under the loan documents between Ringo's Ridge, LLC and the Bank.

    9.    *Property Sales Efforts.* During the Standstill Period, Borrower and Guarantors shall provide the Bank with all necessary and reasonable cooperation in the Bank's continuing due diligence on the Property and Additional Collateral including, but not limited to, providing access upon demand from the Bank to the Property and Additional Collateral for purposes of appraisals, and Borrower and Guarantors shall provide the Bank with bi-annual (June 1 and December 31 of each year during the Standstill Period) updates of all sales efforts for the Property and Additional Collateral, if any, which updates shall include, but shall not be limited to, production of documentary evidence of (a) current status of listing prices or any adjustments thereof, (b) any offers or counteroffers or letters of intent to acquire the Property or Additional Collateral, (c) marketing plans from any of the listing agents for the Property or Additional Collateral, (d) updated strategy to increase buyer-interest in the Property and Additional Collateral should market offers and or interest not be forthcoming or below expectations, and (e) any discussion of market-based events that could have an effect (either positively or negatively) the sale of the Property or Additional Collateral.

    10.    *Financial Reporting.* During the Standstill Period, Borrowers and Guarantors shall provide the Bank with updated corporate and personal financial statements on June 1 and December 31 of each year, and corporate and personal federal income tax returns upon filing of same.

    11.    *Default Interest.* Upon the occurrence of any event of default under the loan documents or a Standstill Termination as defined in Paragraph 14 below, the interest rate shall be increased to 7.25%.

    12.    *Dismissal of Lawsuit.* Upon execution of this Agreement, payment of the Bank's attorney's fees and costs as detailed in Paragraph 6 and payment of the $1,000,000.00 principal

reduction as described in Paragraph 5 above, and satisfaction of all conditions precedent as described in Paragraph 19 below: (a) the Bank will dismiss the Lawsuit, without prejudice; and (b) the Bank shall withdraw of record all foreclosure notices and foreclosure publications pertaining to the Property, reserving the right to foreclose in the event of a breach of this Agreement.

13. *Notices.* All notices hereunder shall be in writing (including, without limitation, notice by facsimile or email) and shall be given to the relevant party at its address, facsimile number or email address set forth below, or such other address, facsimile number or email address as such party may hereafter specify by notice to the other given by United States certified or registered mail. Notices hereunder shall be addressed:

| | |
|---|---|
| to the Borrower at: | Barkston Properties, LLC<br>c/o Pathstone Family Office, LLC<br>3333 Piedmont Road, NE<br>Suite 2000<br>Atlanta, Georgia 30305<br>Attn: Allan J. Zachariah<br>azachariah@pathstone.com and<br>dcooper@kkgpc.com |
| to the Guarantors at: | Charles B. Rice, Sr. and Catherine B. Rice<br>c/o Pathstone Family Office, LLC<br>3333 Piedmont Road, NE<br>Suite 2000<br>Atlanta, Georgia 30305<br>Attn: Allan J. Zachariah<br>azachariah@pathstone.com and<br>dcooper@kkgpc.com |
| to the Bank at: | BMO Harris Bank N.A.<br>111 West Monroe Street<br>Chicago, Illinois 60603<br>Attention: Kenneth Stoklosa (4 West)<br>Telephone: (312) 461-6129<br>Facsimile: (312) 293-4066<br>Email: Kenneth.stoklosa@harrisbank.com |

and

James P. Sullivan
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3445
Facsimile: (312) 516-1445
Email: jsullivan@chapman.com

Each such notice, request or other communication shall be effective (i) if given by mail, on the third business day after such communication is deposited in the mail addressed as aforesaid or (ii) if given by email, on the business day (Monday through Friday) of actual delivery to the email addresses specified in this Section.

14. *Standstill Termination.* As used in this Agreement, *"Standstill Termination"* shall mean the occurrence of the Scheduled Standstill Expiration Date, or, if earlier, the occurrence of any one or more of the following events that are not cured by Borrowers and/or Guarantors within thirty (30) days of the date of the Bank's written notice of default: (a) any Event of Default under the Loan Documents, in each case other than the Existing Default or the Potential Unclaimed Defaults, and subject to the Payment Plan and Amortization Schedule set forth herein; (b) any failure by Borrower or Guarantors for any reason to comply with any term, condition, or provision contained in this Agreement or any other Agreement between the Bank and Borrower and Guarantors, other than the terms resulting in a Potential Unclaimed Default; (c) any representation made by Borrower or Guarantors in this Agreement or pursuant to it proves to be incorrect or misleading in any material respect when made; or (d) any change shall occur in the business, assets, condition (financial or otherwise), or prospects of Borrower or Guarantors, in each case which the Bank deems material and adverse or which, in the Bank's judgment, calls into question Borrower or Guarantors' ability to repay the amounts owing to the Bank. The occurrence of any Standstill Termination shall be deemed an Event of Default under the Loan Documents. Upon the occurrence of a Standstill Termination, the Standstill Period is automatically terminated and the Bank is then permitted to exercise all remedies available to it under the Loan Documents.

15. *No Waiver and Reservation of Rights.* Borrower and Guarantors acknowledge that the Bank is not waiving any of its rights with respect to the Existing Default, but is simply agreeing to forbear from exercising its rights pursuant to the terms herein. Without limiting the generality of the foregoing, Borrower and Guarantors acknowledge and agree that immediately upon expiration of the Standstill Period, the Bank has all of its rights and remedies with respect to the Existing Default to the same extent, and with the same force and effect, as if the forbearance had not occurred. Borrower and Guarantors will not assert and hereby forever waive any right to assert that the Bank is obligated in any way to continue beyond the Standstill Period to forbear from enforcing its rights or remedies or that the Bank is not entitled to act on the Existing Default after the occurrence of a Standstill Termination as if such default had just occurred and the Standstill Period had never existed. Borrower and Guarantors acknowledge

6

that the Bank has made no representations as to what actions, if any, the Bank will take after the Standstill Period or upon the occurrence of any Standstill Termination or an Event of Default, and the Bank must and does hereby specifically reserve any and all rights, remedies, and claims it has (after giving effect hereto) with respect to the Existing Default and each other Event of Default that may occur.

16.   *Acknowledgement of Liens.*  Borrower and Guarantors hereby acknowledge and agree that the obligations owing to the Bank arising out of or in any manner relating to the Loan Documents, as well as all other indebtedness, obligations, and liabilities of Borrower and Guarantors or hereafter owing by Borrower and Guarantors to the Bank, shall continue to be secured by liens on the assets identified in the Loan Documents, and nothing herein contained shall in any manner affect or impair the priority of the liens created and provided for thereby as to the indebtedness, obligations, and liabilities which would be secured thereby prior to giving effect to this Agreement.

17.   RELEASE.  FOR VALUE RECEIVED, INCLUDING WITHOUT LIMITATION, THE AGREEMENTS OF THE BANK IN THIS AGREEMENT, BORROWER AND GUARANTORS HEREBY RELEASE THE BANK, ITS CURRENT AND FORMER SHAREHOLDERS, DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, ATTORNEYS, CONSULTANTS, PREDECESSORS, SUCCESSORS, ASSIGNS AND PROFESSIONAL ADVISORS (COLLECTIVELY, THE *"RELEASED PARTIES"*) OF AND FROM ANY AND ALL DEFENSES, DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, ACTS AND OMISSIONS, LIABILITIES, AND OTHER CLAIMS OF EVERY KIND OR NATURE WHATSOEVER, BOTH IN LAW AND IN EQUITY, KNOWN OR UNKNOWN, WHICH BORROWER AND GUARANTORS HAVE OR EVER HAD AGAINST THE RELEASED PARTIES FROM THE BEGINNING OF THE WORLD TO THIS DATE, INCLUDING, WITHOUT LIMITATION, THOSE ARISING OUT OF THE EXISTING FINANCING ARRANGEMENTS BETWEEN BORROWER AND GUARANTORS AND THE BANK, AND BORROWER AND GUARANTORS FURTHER ACKNOWLEDGE THAT, AS OF THE DATE HEREOF, BORROWER AND GUARANTORS DO NOT HAVE ANY COUNTERCLAIM, SET-OFF, OR DEFENSE AGAINST THE RELEASED PARTIES, EACH OF WHICH BORROWER AND GUARANTORS HEREBY EXPRESSLY WAIVE.

18.   *Loan Documents Remain Effective.*  Except as expressly set forth in this Agreement, all of the obligations of Borrower and Guarantors under the Loan Documents, and the rights and benefits of the Bank thereunder, and the liens created thereby, remain in full force and effect. Without limiting the foregoing, Borrower and Guarantors agree to comply with all of the terms, conditions, and provisions of the Loan Documents except to the extent such compliance is irreconcilably inconsistent with the express provisions of this Agreement, and with the understanding that the Borrowers and the Guarantors shall not be required to cure the Potential Unclaimed Defaults, or to perform the obligations relating thereto.  This Agreement and the Loan Documents are intended by the Bank as a final expression of its agreement and are intended as a complete and exclusive statement of the terms and conditions of that agreement.

19.   *Conditions Precedent.*  The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent: (i) Borrower and Guarantors and the Bank shall have executed and delivered this Agreement and complied with all pre-execution requirements set forth above, and (ii) the Bank shall have received an executed Forbearance

7

Agreement from Ringo's Ridge, LLC and Guarantors and payment of all amounts due upon execution thereof.

20. *Miscellaneous*. By acceptance hereof, Borrower and Guarantors hereby represent that Borrower and Guarantors have the necessary power and authority to execute, deliver, and perform the undertakings contained herein, and that this Agreement constitutes the valid and binding obligation of Borrower and Guarantors enforceable against Borrower and Guarantors in accordance with its terms. Any provision of this Agreement held invalid, illegal, or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability without affecting the validity, legality, and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Unless otherwise expressly stated herein, the provisions of this Agreement shall survive the termination of the Standstill Period. This Agreement may be executed in counterparts and by different parties on separate counterpart signature pages, each of which constitutes an original and all of which taken together constitute one and the same instrument. Delivery of executed counterparts of this Agreement by telecopy or electronic mail shall be effective as an original. This Agreement shall be governed by Illinois law and shall be governed and interpreted on the same basis as the Loan Documents.

[SIGNATURE PAGE TO FOLLOW]

8

THIS SECOND FORBEARANCE AGREEMENT is effective as of the date and year first above written.

BARKSTON PROPERTIES, LLC

Dated: 06/28/2013

By: _____
Charles B. Rice, Sr., Manager

Dated: 06/28/2013

_____
CHARLES B. RICE, SR.

Dated: June 28, 2013

_____
CATHERINE B. RICE

ACCEPTED AND AGREED TO:

BMO HARRIS BANK N.A.

Dated: 6/28/13

By: _____
Philip Lin, Vice President

9

# AMORTIZATION SCHEDULE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $7,398,769.64 | 06-28-2013 | 06-28-2020 | | | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Barkston Properties LLC

**Lender:** BMO Harris Bank N.A.
111 W. Monroe Street
Chicago, IL 60603-4095

Disbursement Date: June 28, 2013
Interest Rate: 2.250

Repayment Schedule: Irregular
Calculation Method: 365/360 U.S. Rule

| Payment Number | Payment Date | Payment Amount | Interest Paid | Principal Paid | Remaining Balance |
|---|---|---|---|---|---|
| 1 | 07-15-2013 | 48,533.13 | 7,861.19 | 40,671.94 | 7,358,097.70 |
| 2 | 08-15-2013 | 48,533.13 | 14,256.31 | 34,276.82 | 7,323,820.88 |
| 3 | 09-15-2013 | 48,533.13 | 14,189.90 | 34,343.23 | 7,289,477.65 |
| 4 | 10-15-2013 | 48,533.13 | 13,667.77 | 34,865.36 | 7,254,612.29 |
| 5 | 11-15-2013 | 48,533.13 | 14,055.81 | 34,477.32 | 7,220,134.97 |
| 6 | 12-15-2013 | 48,533.13 | 13,537.75 | 34,995.38 | 7,185,139.59 |
| **2013 TOTALS:** | | **291,198.78** | **77,568.73** | **213,630.05** | |
| 7 | 01-15-2014 | 48,533.13 | 13,921.21 | 34,611.92 | 7,150,527.67 |
| 8 | 02-15-2014 | 48,533.13 | 13,854.15 | 34,678.98 | 7,115,848.69 |
| 9 | 03-15-2014 | 48,533.13 | 12,452.74 | 36,080.39 | 7,079,768.30 |
| 10 | 04-15-2014 | 48,533.13 | 13,717.05 | 34,816.08 | 7,044,952.22 |
| 11 | 05-15-2014 | 48,533.13 | 13,209.29 | 35,323.84 | 7,009,628.38 |
| 12 | 06-15-2014 | 48,533.13 | 13,581.15 | 34,951.98 | 6,974,676.40 |
| 13 | 06-30-2014 | 500,000.00 | 0.00 | 500,000.00 | 6,474,676.40 |
| 14 | 07-15-2014 | 48,533.13 | 12,608.77 | 35,924.36 | 6,438,752.04 |
| 15 | 08-15-2014 | 48,533.13 | 12,475.08 | 36,058.05 | 6,402,693.99 |
| 16 | 09-15-2014 | 48,533.13 | 12,405.22 | 36,127.91 | 6,366,566.08 |
| 17 | 10-15-2014 | 48,533.13 | 11,937.31 | 36,595.82 | 6,329,970.26 |
| 18 | 11-15-2014 | 48,533.13 | 12,264.32 | 36,268.81 | 6,293,701.45 |
| 19 | 12-15-2014 | 48,533.13 | 11,800.69 | 36,732.44 | 6,256,969.01 |
| **2014 TOTALS:** | | **1,082,397.56** | **154,226.98** | **928,170.58** | |
| 20 | 01-15-2015 | 48,533.13 | 12,122.88 | 36,410.25 | 6,220,558.76 |
| 21 | 02-15-2015 | 48,533.13 | 12,052.33 | 36,480.80 | 6,184,077.96 |
| 22 | 03-15-2015 | 48,533.13 | 10,822.14 | 37,710.99 | 6,146,366.97 |
| 23 | 04-15-2015 | 48,533.13 | 11,908.59 | 36,624.54 | 6,109,742.43 |
| 24 | 05-15-2015 | 48,533.13 | 11,455.77 | 37,077.36 | 6,072,665.07 |
| 25 | 06-15-2015 | 48,533.13 | 11,765.79 | 36,767.34 | 6,035,897.73 |
| 26 | 06-30-2015 | 500,000.00 | 0.00 | 500,000.00 | 5,535,897.73 |
| 27 | 07-15-2015 | 48,533.13 | 10,848.55 | 37,684.58 | 5,498,213.15 |
| 28 | 08-15-2015 | 48,533.13 | 10,652.79 | 37,880.34 | 5,460,332.81 |
| 29 | 09-15-2015 | 48,533.13 | 10,579.39 | 37,953.74 | 5,422,379.07 |
| 30 | 10-15-2015 | 48,533.13 | 10,166.96 | 38,366.17 | 5,384,012.90 |
| 31 | 11-15-2015 | 48,533.13 | 10,431.52 | 38,101.61 | 5,345,911.29 |
| 32 | 12-15-2015 | 48,533.13 | 10,023.58 | 38,509.55 | 5,307,401.74 |
| **2015 TOTALS:** | | **1,082,397.56** | **132,830.29** | **949,567.27** | |
| 33 | 01-15-2016 | 48,533.13 | 10,283.09 | 38,250.04 | 5,269,151.70 |
| 34 | 02-15-2016 | 48,533.13 | 10,208.98 | 38,324.15 | 5,230,827.55 |
| 35 | 03-15-2016 | 48,533.13 | 9,480.87 | 39,052.26 | 5,191,775.29 |
| 36 | 04-15-2016 | 48,533.13 | 10,059.06 | 38,474.07 | 5,153,301.22 |
| 37 | 05-15-2016 | 48,533.13 | 9,662.44 | 38,870.69 | 5,114,430.53 |
| 38 | 06-15-2016 | 48,533.13 | 9,909.21 | 38,623.92 | 5,075,806.61 |
| 39 | 06-30-2016 | 500,000.00 | 0.00 | 500,000.00 | 4,575,806.61 |
| 40 | 07-15-2016 | 48,533.13 | 9,048.39 | 39,484.74 | 4,536,321.87 |
| 41 | 08-15-2016 | 48,533.13 | 8,789.12 | 39,744.01 | 4,496,577.86 |
| 42 | 09-15-2016 | 48,533.13 | 8,712.12 | 39,821.01 | 4,456,756.85 |
| 43 | 10-15-2016 | 48,533.13 | 8,356.42 | 40,176.71 | 4,416,580.14 |
| 44 | 11-15-2016 | 48,533.13 | 8,557.12 | 39,976.01 | 4,376,604.13 |
| 45 | 12-15-2016 | 48,533.13 | 8,206.13 | 40,327.00 | 4,336,277.13 |
| **2016 TOTALS:** | | **1,082,397.56** | **111,272.95** | **971,124.61** | |
| 46 | 01-15-2017 | 48,533.13 | 8,401.54 | 40,131.59 | 4,296,145.54 |
| 47 | 02-15-2017 | 48,533.13 | 8,323.78 | 40,209.35 | 4,255,936.19 |
| 48 | 03-15-2017 | 48,533.13 | 7,447.89 | 41,085.24 | 4,214,850.95 |
| 49 | 04-15-2017 | 48,533.13 | 8,166.27 | 40,366.86 | 4,174,484.09 |
| 50 | 05-15-2017 | 48,533.13 | 7,827.16 | 40,705.97 | 4,133,778.12 |
| 51 | 06-15-2017 | 48,533.13 | 8,009.20 | 40,523.93 | 4,093,254.19 |
| 52 | 06-30-2017 | 500,000.00 | 0.00 | 500,000.00 | 3,593,254.19 |
| 53 | 07-15-2017 | 48,533.13 | 7,206.11 | 41,327.02 | 3,551,927.17 |

## AMORTIZATION SCHEDULE
### (Continued)

| | | | | | |
|---|---|---|---|---|---|
| 54 | 08-15-2017 | 48,533.13 | 6,881.86 | 41,651.27 | 3,510,275.90 |
| 55 | 09-15-2017 | 48,533.13 | 6,801.16 | 41,731.97 | 3,468,543.93 |
| 56 | 10-15-2017 | 48,533.13 | 6,503.52 | 42,029.61 | 3,426,514.32 |
| 57 | 11-15-2017 | 48,533.13 | 6,638.87 | 41,894.26 | 3,384,620.06 |
| 58 | 12-15-2017 | 48,533.13 | 6,346.16 | 42,186.97 | 3,342,433.09 |
| **2017 TOTALS:** | | **1,082,397.56** | **88,553.52** | **993,844.04** | |
| 59 | 01-15-2018 | 48,533.13 | 6,475.96 | 42,057.17 | 3,300,375.92 |
| 60 | 02-15-2018 | 48,533.13 | 6,394.48 | 42,138.65 | 3,258,237.27 |
| 61 | 03-15-2018 | 48,533.13 | 5,701.92 | 42,831.21 | 3,215,406.06 |
| 62 | 04-15-2018 | 48,533.13 | 6,229.85 | 42,303.28 | 3,173,102.78 |
| 63 | 05-15-2018 | 48,533.13 | 5,949.57 | 42,583.56 | 3,130,519.22 |
| 64 | 06-15-2018 | 48,533.13 | 6,065.38 | 42,467.75 | 3,088,051.47 |
| 65 | 06-30-2018 | 500,000.00 | 0.00 | 500,000.00 | 2,588,051.47 |
| 66 | 07-15-2018 | 48,533.13 | 5,321.35 | 43,211.78 | 2,544,839.69 |
| 67 | 08-15-2018 | 48,533.13 | 4,930.63 | 43,602.50 | 2,501,237.19 |
| 68 | 09-15-2018 | 48,533.13 | 4,846.15 | 43,686.98 | 2,457,550.21 |
| 69 | 10-15-2018 | 48,533.13 | 4,607.91 | 43,925.22 | 2,413,624.99 |
| 70 | 11-15-2018 | 48,533.13 | 4,676.40 | 43,856.73 | 2,369,768.26 |
| 71 | 12-15-2018 | 48,533.13 | 4,443.32 | 44,089.81 | 2,325,678.45 |
| **2018 TOTALS:** | | **1,082,397.56** | **65,642.92** | **1,016,754.64** | |
| 72 | 01-15-2019 | 48,533.13 | 4,506.00 | 44,027.13 | 2,281,651.32 |
| 73 | 02-15-2019 | 48,533.13 | 4,420.70 | 44,112.43 | 2,237,538.89 |
| 74 | 03-15-2019 | 48,533.13 | 3,915.69 | 44,617.44 | 2,192,921.45 |
| 75 | 04-15-2019 | 48,533.13 | 4,248.79 | 44,284.34 | 2,148,637.11 |
| 76 | 05-15-2019 | 48,533.13 | 4,028.69 | 44,504.44 | 2,104,132.67 |
| 77 | 06-15-2019 | 48,533.13 | 4,076.76 | 44,456.37 | 2,059,676.30 |
| 78 | 06-30-2019 | 500,000.00 | 0.00 | 500,000.00 | 1,559,676.30 |
| 79 | 07-15-2019 | 48,533.13 | 3,393.15 | 45,139.98 | 1,514,536.32 |
| 80 | 08-15-2019 | 48,533.13 | 2,934.41 | 45,598.72 | 1,468,937.60 |
| 81 | 09-15-2019 | 48,533.13 | 2,846.07 | 45,687.06 | 1,423,250.54 |
| 82 | 10-15-2019 | 48,533.13 | 2,668.59 | 45,864.54 | 1,377,386.00 |
| 83 | 11-15-2019 | 48,533.13 | 2,668.69 | 45,864.44 | 1,331,521.56 |
| 84 | 12-15-2019 | 48,533.13 | 2,496.60 | 46,036.53 | 1,285,485.03 |
| **2019 TOTALS:** | | **1,082,397.56** | **42,204.14** | **1,040,193.42** | |
| 85 | 01-15-2020 | 48,533.13 | 2,490.63 | 46,042.50 | 1,239,442.53 |
| 86 | 02-15-2020 | 48,533.13 | 2,401.42 | 46,131.71 | 1,193,310.82 |
| 87 | 03-15-2020 | 48,533.13 | 2,162.88 | 46,370.25 | 1,146,940.57 |
| 88 | 04-15-2020 | 48,533.13 | 2,222.20 | 46,310.93 | 1,100,529.64 |
| 89 | 05-15-2020 | 48,533.13 | 2,063.68 | 46,469.45 | 1,054,160.19 |
| 90 | 06-28-2020 | 1,057,059.13 | 2,898.94 | 1,054,160.19 | 0.00 |
| **2020 TOTALS:** | | **1,299,724.78** | **14,239.75** | **1,285,485.03** | |
| **TOTALS:** | | **8,085,308.92** | **686,539.28** | **7,398,769.64** | |

NOTICE: This is an estimated loan amortization schedule. Actual amounts may vary if payments are made on different dates or in different amounts.

# EXHIBIT B

TERM LOAN AGREEMENT


DATED AS OF
OCTOBER 24, 2006,


BETWEEN


BARKSTON PROPERTIES, LLC


AND


HARRIS N.A.

TABLE OF CONTENTS

| SECTION | DESCRIPTION | PAGE |
|---|---|---|
| SECTION 1. | THE TERM CREDIT | 1 |
| Section 1.1. | Term Loan | 1 |
| Section 1.2. | Note | 1 |
| Section 1.3. | Manner and Disbursement of Loan | 1 |
| Section 1.4. | Reliance | 2 |
| SECTION 2. | INTEREST AND CHANGE IN CIRCUMSTANCES | 2 |
| Section 2.1. | Interest Rate Options | 2 |
| Section 2.2. | Minimum Amounts | 4 |
| Section 2.3. | Computation of Interest | 4 |
| Section 2.4. | Manner of Rate Selection | 4 |
| Section 2.5. | Change of Law | 4 |
| Section 2.6. | Unavailability of Deposits or Inability to Ascertain Adjusted LIBOR | 4 |
| Section 2.7. | Taxes and Increased Costs | 5 |
| Section 2.8. | Funding Indemnity | 6 |
| Section 2.9. | Lending Branch | 6 |
| Section 2.10. | Discretion of Bank as to Manner of Funding | 6 |
| SECTION 3. | PREPAYMENTS, TERMINATIONS, APPLICATIONS AND CAPITAL ADEQUACY | 7 |
| Section 3.1. | Prepayments | 7 |
| Section 3.2. | Place and Application of Payments | 7 |
| Section 3.3. | Notations | 7 |
| SECTION 4. | COLLATERAL | 8 |
| Section 4.1. | Collateral | 8 |
| Section 4.2. | Guaranties | 8 |
| Section 4.3. | Further Assurances | 8 |
| SECTION 5. | DEFINITIONS; INTERPRETATION | 8 |
| Section 5.1. | Definitions | 8 |
| Section 5.2. | Interpretation | 14 |
| SECTION 6. | REPRESENTATIONS AND WARRANTIES | 14 |
| Section 6.1. | Organization and Qualification | 14 |
| Section 6.2. | Subsidiaries | 14 |
| Section 6.3. | Authority and Validity of Obligations | 14 |
| Section 6.4. | Use of Proceeds; Margin Stock | 14 |

Section 6.5.      Financial Reports ................................................................15
Section 6.6.      No Material Adverse Change........................................................15
Section 6.7.      Full Disclosure .................................................................15
Section 6.8.      Good Title .....................................................................15
Section 6.9.      Litigation and Other Controversies.................................................15
Section 6.10.     Taxes .........................................................................15
Section 6.11.     Approvals......................................................................15
Section 6.12.     Compliance with Laws ............................................................16
Section 6.13.     Other Agreements ...............................................................16
Section 6.14.     ERISA .........................................................................16
Section 6.15.     No Default.....................................................................16

SECTION 7.        CONDITIONS PRECEDENT ..........................................................16

SECTION 8.        COVENANTS .....................................................................18

Section 8.1.      Maintenance of Business .........................................................18
Section 8.2.      Maintenance of Properties ........................................................18
Section 8.3.      Taxes and Assessments...........................................................18
Section 8.4.      Financial Reports ...............................................................18
Section 8.5.      Borrowings and Guaranties........................................................19
Section 8.6.      Liens..........................................................................20
Section 8.7.      Compliance with Laws............................................................20
Section 8.8.      Completion......................................................................20
Section 8.9.      ERISA .........................................................................20
Section 8.10.     Use of Loan Proceeds ............................................................21

SECTION 9.        EVENTS OF DEFAULT AND REMEDIES ...............................................21

Section 9.1.      Events of Default................................................................21
Section 9.2.      Non-Bankruptcy Defaults. ........................................................22
Section 9.3.      Bankruptcy Defaults .............................................................23

SECTION 10.       MISCELLANEOUS .................................................................23

Section 10.1.     Non-Business Days...............................................................23
Section 10.2.     No Waiver, Cumulative Remedies...................................................23
Section 10.3.     Amendments, Etc.................................................................23
Section 10.4.     Costs and Expenses; Indemnification ...............................................23
Section 10.5.     Documentary Taxes..............................................................24
Section 10.6.     Survival of Representations .......................................................24
Section 10.7.     Survival of Indemnities...........................................................24
Section 10.8.     Notices........................................................................25
Section 10.9.     Construction....................................................................25
Section 10.10.    Headings.......................................................................25
Section 10.11.    Severability of Provisions ........................................................25
Section 10.12.    Counterparts ...................................................................25

Section 10.13.    Binding Nature, Governing Law, Etc .............................................26
Section 10.14.    Submission to Jurisdiction; Waiver of Jury Trial ......................26
Section 10.15.    Confidentiality ..............................................................................26

Signature ......................................................................................................................28

Exhibit A   —   Term Loan Note

TERM LOAN AGREEMENT

Harris N.A.
Chicago, Illinois

Ladies and Gentlemen:

The undersigned, Barkston Properties, LLC, a Georgia limited liability company (the *"Borrower"*), applies to you (the *"Bank"*) for your commitment, subject to the terms and conditions hereof and on the basis of the representations and warranties hereinafter set forth, to extend credit to the Borrower, all as more fully hereinafter set forth. All capitalized terms used herein without definition shall have the same meanings herein as such terms are defined in Section 5.1 hereof.

SECTION 1.     THE TERM CREDIT.

*Section 1.1.    Term Loan.* Subject to the terms and conditions hereof, the Bank agrees to make a term loan (the *"Term Loan"*) to the Borrower up to the original principal sum of $9,400,000 (the *"Commitment"*), with the Term Loan to be advanced in multiple disbursements made at any time during the period from and including the date hereof to but not including the Completion Date (the *"Commitment Termination Date"*), at which time the commitment of the Bank to make advances under the Term Loan shall expire. Any portion of the Commitment not advanced on or before the Commitment Termination Date shall no longer be available to the Borrower.

*Section 1.2.    Note.* The Term Loan shall be made against and evidenced by a promissory note of the Borrower, in the form (with appropriate insertions) attached hereto as Exhibit A (the *"Note"*) payable to the order of the Bank in the amount of the Commitment. The Note shall be dated the date of issuance thereof and be expressed to bear interest as set forth in Section 2 hereof. The Term Note, and the Term Loan evidenced thereby, shall mature in 16 quarter-annual principal installments, with the first 15 principal installments to be in the amount of $62,500 payable on the last day of each September, December, March and June of each year (commencing September 30, 2007), with a final installment in the amount of all principal not sooner paid due and payable on the Maturity Date.

*Section 1.3.    Manner and Disbursement of Loan.* The Borrower shall give written or telephonic notice to the Bank (which notice shall be irrevocable once given and, if given by telephone, shall be promptly confirmed in writing) by no later than 11:00 a.m. (Chicago time) on the date the Borrower requests the Bank to make an advance of the Term Loan hereunder. Such notice shall specify the date on which such advance of the Term Loan is to be made (which must be a Business Day) and the amount of such advance to be disbursed. Each advance of the Term Loan shall initially constitute part of the Domestic Rate Portion except to the extent the Borrower has otherwise timely elected that such advance, or any part thereof, constitute part of a Fixed Rate Portion as provided in Section 2 hereof. Subject to the provisions of Section 7

hereof, the proceeds of the Term Loan shall be made available to the Borrower at the main office of the Bank in Chicago, Illinois, in immediately available funds.

Section 1.4. Reliance. Each request for an advance of the Term Loan may be written or oral, including by telephone or telecopy. The Borrower agrees that the Bank may rely on any such notice given by any person the Bank in good faith believes is an Authorized Representative without the necessity of independent investigation (the Borrower hereby indemnifying the Bank from any liability or loss ensuing from such reliance), and in the event any such telephonic or other oral notice conflicts with any written confirmation, such oral or telephonic notice shall govern if the Bank has acted in reliance thereon.

SECTION 2.    INTEREST AND CHANGE IN CIRCUMSTANCES.

Section 2.1. Interest Rate Options. (a) Subject to all of the terms and conditions of this Section 2, portions of the principal indebtedness evidenced by the Note (all of the indebtedness evidenced by the Note which bears interest at the same rate for the same period of time being hereinafter referred to as a "Portion") may, at the option of the Borrower, bear interest with reference to the Domestic Rate (the "Domestic Rate Portion") or with reference to an Adjusted LIBOR ("LIBOR Portions") or with reference to an Offered Rate ("Offered Rate Portions"), and Portions may be converted from time to time from one basis to another. All of the indebtedness evidenced by the Note which is not part of a Fixed Rate Portion shall constitute a single Domestic Rate Portion. All of the indebtedness evidenced by the Note which bears interest with reference to a particular Adjusted LIBOR for a particular Interest Period shall constitute a single LIBOR Portion, and all of the indebtedness evidenced by the Note which bears interest with reference to a particular Offered Rate for a particular Interest Period shall constitute a single Offered Rate Portion. There shall not be more than five Fixed Rate Portions applicable to the Note outstanding at any one time. Anything contained herein to the contrary notwithstanding, the obligation of the Bank to create, continue or effect by conversion any Fixed Rate Portion shall be conditioned upon the fact that at the time no Default or Event of Default shall have occurred and be continuing. The Borrower hereby promises to pay interest on each Portion at the rates and times specified in this Section 2.

(b)    Domestic Rate Portion. The Domestic Rate Portion shall bear interest at the rate per annum determined by subtracting 0.25% from the Domestic Rate as in effect from time to time, provided that if the Domestic Rate Portion or any part thereof is not paid when due (whether by lapse of time, acceleration or otherwise) such Portion shall bear interest, whether before or after judgment, until payment in full thereof at the rate per annum determined by adding 2% to the interest rate which would otherwise be applicable thereto from time to time. Interest on the Domestic Rate Portion shall be payable monthly in arrears on the last day of each month in each year (commencing October 31, 2006) and at maturity of the Note and interest after maturity (whether by demand, lapse of time, acceleration or otherwise) shall be due and payable upon demand. Any change in the interest rate on the Domestic Rate Portion resulting from a change in the Domestic Rate shall be effective on the date of the relevant change in the Domestic Rate.

(c)    LIBOR Portions. Each LIBOR Portion shall bear interest for each Interest Period selected therefor at a rate per annum determined by adding 1.35% to the Adjusted LIBOR for

-2-

such Interest Period, provided that if any LIBOR Portion is not paid when due (whether by lapse of time, acceleration or otherwise) such Portion shall bear interest, whether before or after judgment, until payment in full thereof through the end of the Interest Period then applicable thereto at the rate per annum determined by adding 2% to the interest rate which would otherwise be applicable thereto, and effective at the end of such Interest Period such LIBOR Portion shall automatically be converted into and added to the Domestic Rate Portion and shall thereafter bear interest at the interest rate applicable to the Domestic Rate Portion after default. Interest on each LIBOR Portion shall be due and payable on the last day of each Interest Period applicable thereto and, with respect to any Interest Period applicable to a LIBOR Portion in excess of three months, on the date occurring every three months after the date such Interest Period began and at the end of such Interest Period, and interest after maturity (whether by demand, lapse of time, acceleration or otherwise) shall be due and payable upon demand. The Borrower shall notify the Bank on or before 11:00 a.m. (Chicago time) on the third Business Day preceding the end of an Interest Period applicable to such LIBOR Portion whether such LIBOR Portion is to continue as a LIBOR Portion, in which event the Borrower shall notify the Bank of the new Interest Period selected therefor, and in the event the Borrower shall fail to so notify the Bank, such LIBOR Portion shall automatically be converted into and added to the Domestic Rate Portion as of and on the last day of such Interest Period.

(d)   *Offered Rate Portions.*   Each Offered Rate Portion shall bear interest for each Interest Period selected therefor at the Offered Rate for such Interest Period, provided that if any Offered Rate Portion is not paid when due (whether by lapse of time, acceleration or otherwise) such Portion shall bear interest, whether before or after judgment, until payment in full thereof through the end of the Interest Period then applicable thereto at the rate per annum determined by adding 2% to the interest rate which would otherwise be applicable thereto, and effective at the end of such Interest Period such Offered Rate Portion shall automatically be converted into and added to the Domestic Rate Portion and shall thereafter bear interest at the interest rate applicable to the Domestic Rate Portion after default. Interest on each Offered Rate Portion shall be due and payable on the last day of each Interest Period applicable thereto and, with respect to any Interest Period applicable to an Offered Rate Portion in excess of 90 days, on the date occurring every 90 days after the date such Interest Period began and at the end of such Interest Period, and interest after maturity (whether by lapse of time, acceleration or otherwise) shall be due and payable upon demand. The Borrower shall notify the Bank on or before 11:00 a.m. (Chicago time) on the Business Day preceding the end of an Interest Period applicable to an Offered Rate Portion whether such Offered Rate Portion is to continue as an Offered Rate Portion, in which event the Borrower shall notify the Bank of the new Interest Period selected therefor, and in the event the Borrower shall fail to so notify the Bank, such Offered Rate Portion shall automatically be converted into and added to the Domestic Rate Portion as of and on the last day of such Interest Period. The Borrower understands and agrees that the Bank has no obligation to quote Offered Rates or to make any Offered Rate Portion available to the Borrower, that the Bank may refuse to make any such Offered Rate Portion after receiving a request therefor from the Borrower, and that any such Offered Rate Portion made available to the Borrower shall be subject to such other terms and conditions as are mutually agreed upon by the Borrower and the Bank. The Borrower shall, in connection with the selection of each Offered Rate, execute and deliver to the Bank a Hedging Agreement in form and substance satisfactory to the Bank.

Section 2.2. *Minimum Amounts.* Each request for an advance bearing interest with reference to the Domestic Rate shall be in an amount equal to $50,000 or such greater amount which is in an integral multiple of $10,000. Each LIBOR Portion shall be in an amount equal to $500,000 or such greater amount which is in an integral multiple of $100,000. Each Offered Rate Portion shall be in an amount equal to $1,000,000 or such greater amount which is in an integral multiple of $100,000.

Section 2.3. *Computation of Interest.* All interest on the Note shall be computed on the basis of a year of 360 days for the actual number of days elapsed.

Section 2.4. *Manner of Rate Selection.* The Borrower shall notify the Bank by (i) 11:00 a.m. (Chicago time) at least three Business Days prior to the date upon which the Borrower requests that any LIBOR Portion be created or that any part of the Domestic Rate Portion or any part of an Offered Rate Portion be converted into a LIBOR Portion and (ii) 11:00 a.m. (Chicago time) at least one Business Day prior to the date upon which the Borrower requests that any Offered Rate Portion be created or that any part of the Domestic Rate Portion or any part of a LIBOR Portion be converted into an Offered Rate Portion (each such notice to specify in each instance the amount thereof and the Interest Period selected therefor). If any request is made to convert a Fixed Rate Portion into another type of Portion available hereunder, such conversion shall only be made so as to become effective as of the last day of the Interest Period applicable thereto. All requests for the creation, continuance and conversion of Portions under this Agreement shall be irrevocable. Such requests may be written or oral and the Bank is hereby authorized to honor telephonic requests for creations, continuances and conversions received by it from any person the Bank in good faith believes to be an Authorized Representative without the need of independent investigation, the Borrower hereby indemnifying the Bank from any liability or loss ensuing from so acting.

Section 2.5. *Change of Law.* Notwithstanding any other provisions of this Agreement or the Note, if at any time the Bank shall determine in good faith that any change in applicable laws, treaties or regulations or in the interpretation thereof makes it unlawful for the Bank to create or continue to maintain any Fixed Rate Portion, it shall promptly so notify the Borrower and the obligation of the Bank to create, continue or maintain any such Fixed Rate Portion under this Agreement shall terminate until it is no longer unlawful for the Bank to create, continue or maintain such Fixed Rate Portion. The Borrower, on demand, shall, if the continued maintenance of any such Fixed Rate Portion is unlawful, thereupon prepay the outstanding principal amount of the affected Fixed Rate Portion, together with all interest accrued thereon and all other amounts payable to the Bank with respect thereto under this Agreement; *provided, however,* that the Borrower may elect to convert the principal amount of the affected Portion into another type of Portion available hereunder, subject to the terms and conditions of this Agreement.

Section 2.6. *Unavailability of Deposits or Inability to Ascertain Adjusted LIBOR.* Notwithstanding any other provision of this Agreement or the Note, if prior to the commencement of any Interest Period, the Bank shall determine in good faith that deposits in the amount of any LIBOR Portion scheduled to be outstanding during such Interest Period are not readily available to the Bank in the relevant market or, by reason of circumstances affecting the

-4-

relevant market, adequate and reasonable means do not exist for ascertaining Adjusted LIBOR, then the Bank shall promptly give notice thereof to the Borrower and the obligations of the Bank to create, continue or effect by conversion any such Fixed Rate Portion in such amount and for such Interest Period shall terminate until deposits in such amount and for the Interest Period selected by the Borrower shall again be readily available in the relevant market and adequate and reasonable means exist for ascertaining Adjusted LIBOR.

Section 2.7.  *Taxes and Increased Costs.*  With respect to any Fixed Rate Portion, if the Bank shall determine in good faith that any change in any applicable law, treaty, regulation or guideline (including, without limitation, Regulation D of the Board of Governors of the Federal Reserve System) or any new law, treaty, regulation or guideline, or any interpretation of any of the foregoing by any governmental authority charged with the administration thereof or any central bank or other fiscal, monetary or other authority having jurisdiction over the Bank or its lending branch or the Fixed Rate Portions contemplated by this Agreement (whether or not having the force of law), shall:

> (i)  impose, increase, or deem applicable any reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of, or loans by, or any other acquisition of funds or disbursements by, the Bank which is not in any instance already accounted for in computing the interest rate applicable to such Fixed Rate Portion;

> (ii)  subject the Bank, any Fixed Rate Portion or the Note to the extent it evidences such a Portion to any tax (including, without limitation, any United States interest equalization tax or similar tax however named applicable to the acquisition or holding of debt obligations and any interest or penalties with respect thereto), duty, charge, stamp tax, fee, deduction or withholding in respect of this Agreement, any Fixed Rate Portion or the Note to the extent it evidences such a Portion, except such taxes as may be measured by the overall net income or gross receipts of the Bank or its lending branches and imposed by the jurisdiction, or any political subdivision or taxing authority thereof, in which the Bank's principal executive office or its lending branch is located;

> (iii)  change the basis of taxation of payments of principal and interest due from the Borrower to the Bank hereunder or under the Note to the extent it evidences any Fixed Rate Portion (other than by a change in taxation of the overall net income or gross receipts of the Bank); or

> (iv)  impose on the Bank any penalty with respect to the foregoing or any other condition regarding this Agreement, any Fixed Rate Portion, or its disbursement, or the Note to the extent it evidences any Fixed Rate Portion;

and the Bank shall determine in good faith that the result of any of the foregoing is to increase the cost (whether by incurring a cost or adding to a cost) to the Bank of creating or maintaining any Fixed Rate Portion hereunder or to reduce the amount of principal or interest received or receivable by the Bank (without benefit of, or credit for, any prorations, exemption, credits or other offsets available under any such laws, treaties, regulations, guidelines or interpretations

thereof), then the Borrower shall pay on demand to the Bank from time to time as specified by the Bank such additional amounts as the Bank shall reasonably determine are sufficient to compensate and indemnify it for such increased cost or reduced amount. If the Bank makes such a claim for compensation, it shall provide to the Borrower a certificate setting forth the computation of the increased cost or reduced amount as a result of any event mentioned herein in reasonable detail and such certificate shall be conclusive if reasonably determined.

Section 2.8. *Funding Indemnity.* In the event the Bank shall incur any loss, cost or expense (including, without limitation, any loss (including loss of profit), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired or contracted to be acquired by the Bank to fund or maintain any Fixed Rate Portion or the relending or reinvesting of such deposits or other funds or amounts paid or prepaid to the Bank or incurred by reason of the termination of any Hedging Agreement) as a result of:

(i) any payment of a Fixed Rate Portion on a date other than the last day of the then applicable Interest Period for any reason, whether before or after default, and whether or not such payment is required by any provisions of this Agreement; or

(ii) any failure by the Borrower to create, borrow, continue or effect by conversion a Fixed Rate Portion on the date specified in a notice given pursuant to this Agreement;

then upon the demand of the Bank, the Borrower shall pay to the Bank such amount as will reimburse the Bank for such loss, cost or expense. If the Bank requests such a reimbursement, it shall provide to the Borrower a certificate setting forth the computation of the loss, cost or expense giving rise to the request for reimbursement in reasonable detail and such certificate shall be conclusive if reasonably determined.

Section 2.9. *Lending Branch.* The Bank may, at its option. elect to make, fund or maintain Portions of the Term Loan hereunder at such of its branches or offices as the Bank may from time to time elect. To the extent reasonably possible, the Bank shall designate an alternate branch or funding office with respect to the Fixed Rate Portions to reduce any liability of the Borrower to the Bank under Section 2.7 hereof or to avoid the unavailability of an interest rate option under Section 2.6 hereof, so long as such designation is not otherwise disadvantageous to the Bank.

Section 2.10. *Discretion of Bank as to Manner of Funding.* Notwithstanding any provision of this Agreement to the contrary, the Bank shall be entitled to fund and maintain its funding of all or any part of the Note in any manner it sees fit, it being understood, however, that for the purposes of this Agreement all determinations hereunder (including, without limitation, determinations under Sections 2.6, 2.7 and 2.8 hereof) shall be made as if the Bank had actually funded and maintained each Fixed Rate Portion during each Interest Period applicable thereto through the purchase of deposits in the relevant market in the amount of such Fixed Rate Portion, having a maturity corresponding to such Interest Period, and, in the case of any LIBOR Portion bearing an interest rate equal to the LIBOR for such Interest Period.

SECTION 3.     PREPAYMENTS, TERMINATIONS, APPLICATIONS AND CAPITAL ADEQUACY.

Section 3.1.   Prepayments.

(a)   Voluntary. The Borrower shall have the privilege of prepaying the Note in whole or in part (but, if in part, then (i) if such Loan constitutes part of the Domestic Rate Portion of the Note, in an amount not less than $100,000, (ii) if such Loan constitutes part of a Fixed Rate Portion, in an amount not less than $500,000, and (iii) in each case, in an amount such that the minimum amount required for a Loan pursuant to Section 2.2 hereof remain outstanding) at any time upon one Business Day's prior notice to the Bank (such notice if received subsequent to 11:00 a.m. (Chicago time) on a given day to be treated as though received at the opening of business on the next Business Day), by paying to the Bank the principal amount to be prepaid and, if such a prepayment prepays the Note in full such prepayment is accompanied by accrued interest thereon to the date of prepayment and any amounts due the Bank under Section 2.8 hereof.

(b)   Mandatory. The Borrower covenants and agrees that if at any time after the Completion of Improvements the principal amount of the Loans then outstanding shall be in excess of the Completed Loanable Value as then determined and computed based upon an appraisal or inspection report to be ordered by the Bank upon receipt of notice from the Borrower of Completion of Improvements, the Borrower shall immediately upon the Bank's demand pay over the amount of the excess to the Bank as and for a mandatory prepayment on such Obligations. The Borrower shall pay to the Bank the cost of any appraiser's inspection report or appraisal requested by the Bank in connection with the Bank's determination of the Completed Loanable Value.

Section 3.2.   Place and Application of Payments. All payments of principal, interest, fees and all other Obligations payable under the Loan Documents shall be made to the Bank at its main office at 111 West Monroe Street, Chicago, Illinois (or at such other place as the Bank may specify) no later than 1:00 p.m. (Chicago time) on the date any such payment is due and payable. Payments received by the Bank after 1:00 p.m. (Chicago time) shall be deemed received as of the opening of business on the next Business Day. All such payments shall be made in lawful money of the United States of America, in immediately available funds at the place of payment, without set-off or counterclaim and without reduction for, and free from, any and all present or future taxes, levies, imposts, duties, fees, charges, deductions, withholdings, restrictions and conditions of any nature imposed by any government or any political subdivision or taxing authority thereof (but excluding any taxes imposed on or measured by the net income of the Bank). Unless the Borrower otherwise directs, principal payments shall be first applied to the Domestic Rate Portion of the Note until payment in full thereof, with any balance applied to the Fixed Rate Portions in the order in which their Interest Periods expire. No amount paid or prepaid on the Note may be reborrowed. The Borrower may elect, upon notice to the Bank, to make such payments through an ACH Debit Account or other automatic withdrawal account.

Section 3.3.   Notations. The Term Loan made against the Note, the status of all amounts evidenced by the Note as constituting part of the Domestic Rate Portion or a LIBOR Portion or an Offered Rate Portion, and, in the case of any Fixed Rate Portion, the rates of interest and

-7-

Interest Periods applicable to such Portions shall be recorded by the Bank on its books and records or, at its option in any instance, endorsed on a schedule to the Note and the unpaid principal balance and status, rates and Interest Periods so recorded or endorsed by the Bank shall be prima facie evidence in any court or other proceeding brought to enforce the Note of the principal amount remaining unpaid thereon, the status of the Term Loan evidenced thereby and the interest rates and Interest Periods applicable thereto; provided that the failure of the Bank to record any of the foregoing shall not limit or otherwise affect the obligation of the Borrower to repay the principal amount of the Note together with accrued interest thereon. Prior to any negotiation of the Note, the Bank shall record on a schedule thereto the status of all amounts evidenced thereby as constituting part of the Domestic Rate Portion or a LIBOR Portion or an Offered Rate Portion and, in the case of any Fixed Rate Portion, the rates of interest and the Interest Periods applicable thereto.

SECTION 4.     COLLATERAL.

*Section 4.1.    Collateral.* The Obligations and the Hedging Liability shall be secured by valid, perfected and enforceable Liens on all right, title and interest of the Borrower in the Residential Property and all rents, issues and profits therefrom as more particularly described in the Deed to Secure Debt. The Borrower acknowledges and agrees that the Liens on the Collateral shall be valid and perfected first priority Liens.

*Section 4.2.    Guaranties.* The payment and performance of the Obligations and the Hedging Liability shall at all times be guaranteed, jointly and severally, by Charles B. Rice, Sr. and Catherine B. Rice (each, a *"Guarantor,"* and collectively, the *"Guarantors"*) pursuant to a guaranty agreement in form and substance acceptable to the Bank, as the same may be amended, modified or supplemented from time to time (the *"Guaranty"*).

*Section 4.3.    Further Assurances.* The Borrower agrees that it shall, from time to time at the request of the Bank, execute and deliver such documents and do such acts and things as the Bank may reasonably request in order to provide for or perfect or protect such Liens on the Collateral.

SECTION 5.     DEFINITIONS; INTERPRETATION.

*Section 5.1.    Definitions.* The following terms when used herein shall have the following meanings:

*"Adjusted LIBOR"* means a rate per annum determined by the Bank in accordance with the following formula:

$$\text{Adjusted LIBOR} = \frac{\text{LIBOR}}{100\% - \text{Reserve Percentage}}$$

*"Reserve Percentage"* means, for the purpose of computing Adjusted LIBOR, the maximum rate of all reserve requirements (including, without limitation, any marginal, emergency,

supplemental or other special reserves) imposed by the Board of Governors of the Federal Reserve System (or any successor) under Regulation D on Eurocurrency liabilities (as such term is defined in Regulation D) for the applicable Interest Period as of the first day of such Interest Period, but subject to any amendments to such reserve requirement by such Board or its successor, and taking into account any transitional adjustments thereto becoming effective during such Interest Period. For purposes of this definition, LIBOR Portions shall be deemed to be Eurocurrency liabilities as defined in Regulation D without benefit of or credit for prorations, exemptions or offsets under Regulation D. *"LIBOR"* means, for each Interest Period, (a) the LIBOR Index Rate for such Interest Period, if such rate is available, and (b) if the LIBOR Index Rate cannot be determined, the arithmetic average of the rates of interest per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) at which deposits in U.S. Dollars in immediately available funds are offered to the Bank at 11:00 a.m. (London, England time) two Business Days before the beginning of such Interest Period by three or more major banks in the interbank eurodollar market selected by the Bank for a period equal to such Interest Period and in an amount equal or comparable to the applicable LIBOR Portion scheduled to be outstanding from the Bank during such Interest Period. *"LIBOR Index Rate"* means, for any Interest Period, the rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in U.S. Dollars for a period equal to such Interest Period, which appears on the Telerate Page 3750 as of 11:00 a.m. (London, England time) on the day two Business Days before the commencement of such Interest Period. *"Telerate Page 3750"* means the display designated as *"Page 3750"* on the Telerate Service (or such other page as may replace Page 3750 on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar deposits). Each determination of LIBOR made by the Bank shall be conclusive and binding absent manifest error.

*"Agreement"* means this Term Loan Agreement, as the same may be amended, modified or restated from time to time in accordance with the terms hereof.

*"Authorized Representative"* means those persons shown on the list provided by the Borrower pursuant to Section 7 hereof, or on any update of any such list provided by the Borrower to the Bank, or any further or different persons so named by any Authorized Representative of the Borrower in a written notice to the Bank.

*"Bank"* is defined in the introductory paragraph hereof.

*"Borrower"* is defined in the introductory paragraph hereof.

*"Business Day"* means any day other than a Saturday or Sunday on which the Bank is not authorized or required to close in Chicago, Illinois and, when used with respect to LIBOR Portions, a day on which the Bank is also dealing in United States Dollar deposits in London, England and Nassau, Bahamas.

*"Capital Lease"* means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee.

"*Capitalized Lease Obligation*" means the amount of the liability shown on the balance sheet of any Person in respect of a Capital Lease as determined in accordance with GAAP.

"*Code*" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"*Collateral*" means the Residential Property and all other properties, rights, interests and privileges from time to time subject to the Liens granted to the Bank by the Collateral Documents.

"*Collateral Documents*" means the Deed to Secure Debt and all other mortgages, deeds of trust, security agreements, assignments, financing statements and other documents as shall from time to time secure the Obligations and the Hedging Liability.

"*Commitment*" is defined in Section 1.1 hereof.

"*Commitment Termination Date*" is defined in Section 1.1 hereof.

"*Completed Loanable Value*" means 65% of the loanable value of the Residential Property after Completion of Improvements as determined by the Bank pursuant to the inspection report or appraisal to be ordered by the Bank in accordance with Section 3.1(b) hereof.

"*Completion Date*" means March 31, 2008.

"*Completion of Improvements*" means the date on which construction of the improvements on the Residential Property is completed.

"*Deed to Secure Debt*" means that certain Deed to Secure Debt and Security Agreement with Assignment of Rents dated as of even date herewith between the Borrower and the Bank, as the same may be amended, modified, supplemented or restated from time to time.

"*Default*" means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"*Domestic Rate*" means, for any day, the greater of (a) the rate of interest announced by the Bank from time to time as its prime commercial rate, as in effect on such day (it being understood and agreed that such rate may not be the Bank's best or lowest rate); and (b) the sum of (i) the rate determined by the Bank to be the average (rounded upwards, if necessary, to the next higher 1/100 of 1%) of the rates per annum quoted to the Bank at approximately 10:00 a.m. (Chicago time) (or as soon thereafter as is practicable) on such day (or, if such day is not a Business Day, on the immediately preceding Business Day) by two or more Federal funds brokers selected by the Bank for the sale to the Bank at face value of Federal funds in an amount equal or comparable to the principal amount owed to the Bank for which such rate is being determined, *plus* (ii) 3/8 of 1%.

*"Domestic Rate Portion"* is defined in Section 2.1(a) hereof.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended from time to time.

*"Event of Default"* means any event or condition identified as such in Section 9.1 hereof.

*"Fixed Rate Portions"* means and includes LIBOR Portions and Offered Rate Portions, unless the context in which such term is used shall otherwise require.

*"GAAP"* means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

*"Guarantor"* is defined in Section 4.2 hereof.

*"Guaranty"* is defined in Section 4.2 hereof.

*"Hedging Agreement"* means any instrument, document or agreement evidencing or setting forth terms and conditions relating to any Hedging Liability.

*"Hedging Liability"* means the liability of the Borrower to the Bank, or any Affiliate of the Bank, in respect of any interest rate, swap, exchange, cap, collar, floor, forward, future or option agreement, or any other similar interest rate hedging arrangement, as the Borrower may from time to time enter into with the Bank or its Affiliates or which the Bank may from time to time enter into in connection with any Offered Rate Portion.

*"Indebtedness for Borrowed Money"* means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services, (c) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all Capitalized Lease Obligations of such Person, and (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money.

*"Interest Period"* means, with respect to (a) any LIBOR Portion, the period commencing on, as the case may be, the creation, continuation or conversion date with respect to such LIBOR Portion and ending one, two, three, six, nine or twelve months thereafter as selected by the Borrower in the notice as provided herein, and (b) any Offered Rate Portion, the period commencing on, as the case may be, the creation, continuation or conversion date with respect to such Offered Rate Portion and ending on the date selected by the Borrower in the notice as

provided herein; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

    (i)    if any Interest Period would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day, unless in the case of an Interest Period for a LIBOR Portion the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

    (ii)    no Interest Period may extend beyond the Maturity Date;

    (iii)    the interest rate to be applicable to each Portion for each Interest Period shall apply from and including the first day of such Interest Period to but excluding the last day thereof; and

    (iv)    no Interest Period may be selected if after giving effect thereto the Borrower will be unable to make a principal payment scheduled to be made during such Interest Period without paying part of a Fixed Rate Portion on a date other than the last day of the Interest Period applicable thereto.

For purposes of determining an Interest Period, a month means a period starting on one day in a calendar month and ending on a numerically corresponding day in the next calendar month, *provided, however,* if an Interest Period begins on the last day of a month or if there is no numerically corresponding day in the month in which an Interest Period is to end, then such Interest Period shall end on the last Business Day of such month.

*"LIBOR Portions"* is defined in Section 2.1(a) hereof.

*"Lien"* means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

*"Loan Documents"* means this Agreement, the Note, the Collateral Documents, the Hedging Agreements and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection therewith.

*"Material Adverse Effect"* means (a) a material adverse change in, or material adverse effect upon, the operations, business, Property, condition (financial or otherwise) or prospects of the Borrower, (b) a material impairment of the ability of the Borrower to perform its obligations under any Loan Document, or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against the Borrower of any Loan Document or the rights and remedies of the Bank thereunder or (ii) the perfection or priority of any Lien granted under any Collateral Document.

*"Maturity Date"* means September 30, 2011 or such earlier date on which the Commitment is terminated in whole pursuant to Section 9.2 or 9.3 hereof.

-12-

*"Multiemployer Plan"* has the meaning given to such term in ERISA.

*"Note"* is defined in Section 1.2 hereof.

*"Obligations"* means all obligations of the Borrower to pay principal and interest on the Term Loan, all fees and charges payable hereunder, and all other payment obligations of the Borrower arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

*"Offered Rate"* means the rate per annum quoted to the Borrower by the Bank for the applicable Interest Period, such Offered Rate being subject at all times to the provisions of Section 2.1(d) hereof.

*"Offered Rate Portions"* is defined in Section 2.1(a) hereof.

*"Person"* means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

*"Plan"* means a *"pension plan"* as such term is defined in ERISA, which is covered by Title IV of ERISA, established or maintained by the Borrower, or as to which the Borrower, contributed or is a member or otherwise may have any liability.

*"Portion"* is defined in Section 2.1(a) hereof.

*"Property"* means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

*"Residential Property"* means the real property commonly known as 9095 and 9110 Barkston Drive in Alpharetta, Georgia, all buildings and structures situated thereon and all fixtures related thereto.

*"Sebastian Holdings"* means Sebastian Investment Holdings, LLC, a Georgia limited liability company.

*"Term Loan"* is defined in Section 1.1 hereof.

*"Title Company"* means Commonwealth Land Title Insurance Company, or any other title insurance company mutually acceptable to the Bank and the Borrower.

*"Unencumbered Liquid Assets"* means cash, cash equivalents, marketable securities, U.S. Treasury bonds, notes or bills, A or better rated commercial paper of a duration not exceeding three months, Eurodollar investments with a duration not exceeding three months, and publicly traded mutual fund shares, in each case, which are unrestricted, freely available and not subject to any Lien.

*Section 5.2.    Interpretation.*  The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined. The words *"hereof"*, *"herein"*, and *"hereunder"* and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All references to time of day herein are references to Chicago, Illinois time unless otherwise specifically provided. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the specific provisions of this Agreement.

SECTION 6.        REPRESENTATIONS AND WARRANTIES.

The Borrower represents and warrants to the Bank as follows:

*Section 6.1.    Organization and Qualification.*  The Borrower is duly organized, validly existing and in good standing as a limited liability company under the laws of the State of Georgia, has full and adequate power to own its Property and conduct its business as now conducted, and is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying. The copy of the Borrower's limited liability company agreement heretofore delivered to the Bank is true, correct and complete and has not been amended or modified in any respect.

*Section 6.2.    Subsidiaries.*  The Borrower has no subsidiaries.

*Section 6.3.    Authority and Validity of Obligations.*  The Borrower has full right and authority to enter into this Agreement and the other Loan Documents, to make the borrowings herein provided for, to issue the Note in evidence thereof, to grant to the Bank the Liens described in the Collateral Documents, and to perform all of its obligations hereunder and under the other Loan Documents. The Loan Documents delivered by the Borrower have been duly authorized, executed and delivered by the Borrower and constitute valid and binding obligations of the Borrower enforceable in accordance with their terms except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by the Borrower of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon the Borrower or any provision of the articles of organization or operating agreement of the Borrower or any covenant, indenture or agreement of or affecting the Borrower or any of its Property, or (b) result in the creation or imposition of any Lien on any Property of the Borrower except for the Liens granted to the Bank pursuant to the Loan Documents.

*Section 6.4.    Use of Proceeds; Margin Stock.*  The Borrower shall use the proceeds of the first advance of the Term Loan to refinance existing indebtedness secured by the Residential Property and the proceeds of subsequent advances solely for such legal and proper purposes as

-14-

are consistent with all applicable laws. The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of the Term Loan will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

Section 6.5.  *Financial Reports.*  The financial statements heretofore furnished to the Bank fairly present the financial condition of the Borrower and the Guarantors as of the dates described therein, and the forms thereof are satisfactory to the Bank. The Borrower has no contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 8.4 hereof.

Section 6.6.  *No Material Adverse Change.*  Since June 7, 2006, there has been no change in the condition (financial or otherwise) or business prospects of the Borrower except those occurring in the ordinary course, none of which individually or in the aggregate have been materially adverse.

Section 6.7.  *Full Disclosure.*  The statements and information furnished to the Bank in connection with the negotiation of this Agreement and the other Loan Documents and the commitment by the Bank to provide all or part of the financing contemplated hereby do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not misleading, the Bank acknowledging that as to any projections furnished to the Bank the Borrower only represents that the same were prepared on the basis of information and estimates the Borrower believed to be reasonable.

Section 6.8.  *Good Title.*  The Borrower has good and defensible title to the Residential Property and to its assets as reflected on the most recent financial statements of the Borrower furnished to the Bank, subject to no Liens other than such thereof as are permitted by Section 8.6 hereof.

Section 6.9.  *Litigation and Other Controversies.*  There is no litigation or governmental proceeding pending, nor to the knowledge of the Borrower threatened, against the Borrower which if adversely determined could reasonably be expected to have a Material Adverse Effect.

Section 6.10.  *Taxes.*  If tax returns are required to be filed by the Borrower in any jurisdiction, such tax returns have, in fact, been filed, and all taxes, assessments, fees and other governmental charges upon the Borrower or upon the Residential Property or upon any of the Borrower's Properties, income or franchises, which are shown to be due and payable in such returns, have been paid, except such taxes, assessments, fees and governmental charges, if any, as are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves have been provided.

Section 6.11.  *Approvals.*  No authorization, consent, license, or exemption from, or filing or registration with, any court or governmental department, agency or instrumentality, nor any

approval or consent of any Person, is or will be necessary to the valid execution, delivery or performance by the Borrower of this Agreement or any other Loan Document.

Section 6.12. *Compliance with Laws.* The Borrower is in compliance with the requirements of all federal, state and local laws, rules and regulations applicable to or pertaining to its Property or business operations (including, without limitation, the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes and substances), non-compliance with which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. The Borrower has not received notice to the effect that its Properties are not in compliance with any of the requirements of applicable federal, state or local environmental, health and safety statutes and regulations or are the subject of any governmental investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, which non-compliance or remedial action, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 6.13. *Other Agreements.* The Borrower is not in default under the terms of any covenant, indenture or agreement of or affecting the Borrower or any of its Properties, which default if uncured could have a Material Adverse Effect.

Section 6.14. *ERISA.* The Borrower does not maintain, contribute to or have any liability with respect to any Plan or any Multiemployer Plan.

Section 6.15. *No Default.* No Default or Event of Default has occurred and is continuing.

SECTION 7. CONDITIONS PRECEDENT.

The obligation of the Bank to make any advance of the Term Loan under this Agreement is subject to the following conditions precedent:

     (a)    each of the representations and warranties set forth in Section 6 hereof and in the other Loan Documents shall be true and correct as of such time, except to the extent the same expressly relate to an earlier date;

     (b)    the Borrower shall be in compliance with the terms and conditions of this Agreement and of the other Loan Documents, and no Default or Event of Default shall have occurred and be continuing or would occur as a result of making such advance of the Term Loan;

     (c)    the Term Loan shall not violate any order, judgment or decree of any court or other authority or any provision of law or regulation applicable to the Bank (including, without limitation, Regulation U of the Board of Governors of the Federal Reserve System) as then in effect.

(d)     the Bank shall have received the following (each to be properly executed and completed) and the same shall have been approved as to form and substance by the Bank:

(i)     the Note;

(ii)    the Deed to Secure Debt, together with any financing statements requested by the Bank in connection therewith;

(iii)   the Guaranty;

(iv)    copies (executed or certified, as may be appropriate) of all legal documents or proceedings taken in connection with the execution and delivery of this Agreement and the other Loan Documents to the extent the Bank or its counsel may reasonably request; and

(v)     an incumbency certificate containing the name, title and genuine signatures of the Borrower's Authorized Representatives;

(e)     the Guarantors shall have conveyed title to the Residential Property to the Borrower;

(f)     the Bank shall have received such valuations and certifications as it may require in order to satisfy itself as to the value of the Collateral, the financial condition of the Borrower and the Guarantors and the lack of material contingent liabilities of the Borrower and the Guarantors;

(g)     legal matters incident to the execution and delivery of this Agreement and the other Loan Documents and to the transactions contemplated hereby shall be satisfactory to the Bank and its counsel;

(h)     the Bank shall have received a good standing certificate for the Borrower (dated as of the date no earlier than 45 days prior to the date hereof) from the office of the Georgia Secretary of State;

(i)     the Bank shall have received evidence of insurance required to be maintained under the Loan Documents, naming the Bank as mortgagee and loss payee;

(j)     the Bank shall have received a mortgagee's title insurance policy (or a prepaid binding commitment therefor) in form and substance acceptable to the Bank from the Title Company in the aggregate amount of $9,400,000 insuring the Lien of the Deed to Secure Debt to be valid first priority Lien subject to no defects or objections which are unacceptable to the Bank, together with such endorsements as the Bank may require;

(k)     the Bank shall have received a survey in form and substance acceptable to the Bank prepared by a licensed surveyor on each parcel of real property subject to the

Lien of the Deed to Secure Debt, which survey shall also state whether or not any portion of such real property is in a federally designated flood hazard area;

(l)     the Bank shall have received an appraisal report prepared by state certified appraiser selected by the Bank, which appraisal report describes the fair market value of the property subject to the Lien of the Deed to Secure Debt and otherwise meets the requirements of applicable law for appraisals prepared for federally insured depository institutions;

(m)    the Bank shall have received financing statement, tax lien, mechanics lien, and judgment lien search results against the Property of the Borrower evidencing the absence of Liens on its Property except as permitted by Section 8.6 hereof;

(n)    the Liens granted to the Bank under the Collateral Documents shall have been perfected in a manner satisfactory to the Bank and its counsel;

(o)    the Bank shall have received the favorable written opinion of counsel to the Borrower, in form and substance satisfactory to the Bank; and

(p)    the Bank shall have received such other agreements, instruments, documents, certificates and opinions as the Bank may reasonably request.

SECTION 8.     COVENANTS.

The Borrower agrees that, so long as any credit is available to or in use by the Borrower hereunder, except to the extent compliance in any case or cases is waived in writing by the Bank:

Section 8.1.    *Maintenance of Business.*  The Borrower shall preserve and maintain its existence.  The Borrower shall preserve and keep in force and effect all licenses, permits and franchises necessary to the proper conduct of its business.

Section 8.2.    *Maintenance of Properties.*  Subject to the construction and/or alteration of improvements on the Residential Property, the Borrower shall maintain, preserve and keep its Property in good repair, working order and condition (ordinary wear and tear excepted) and shall from time to time make all needful and proper repairs, renewals, replacements, additions and betterments thereto so that at all times the efficiency thereof shall be fully preserved and maintained.

Section 8.3.    *Taxes and Assessments.*  The Borrower shall duly pay and discharge all taxes, rates, assessments, fees and governmental charges upon or against it or its Property, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.

Section 8.4.    *Financial Reports.*  The Borrower shall furnish to the Bank and its duly authorized representatives such information respecting the financial condition of the Borrower as

the Bank may reasonably request; and without any request, shall furnish, or cause to be furnished, to the Bank:

(a)    as soon as available, and in any event within 90 days after the last day of each fiscal year of the Borrower, a copy of the balance sheet, income statement and statement of capital accounts of the Borrower as of the last day of such period, in reasonable detail showing in comparative form the figures for the previous fiscal year, prepared by the Borrower in accordance with sound accounting practices consistently applied and certified to by its manager or such other officer acceptable to the Bank;

(b)    if the Borrower files a federal income tax return, then as soon as available, and in any event not later than 30 days after being filed with the Internal Revenue Service, a complete copy of the Borrower's federal income tax returns for the immediately preceding year;

(c)    as soon as available, and in any event not later than 30 days after being filed with the Internal Revenue Service, a complete copy of the Guarantors' federal income tax return (including all Form K-1s and Schedules) for the immediately preceding year;

(d)    promptly, and in any event within 5 days after the Completion of Improvements, written notice that the Completion of Improvements has occurred;

(e)    as soon as available, and in any event not later than April 30 of each year or 15 days after the Guarantors' federal income tax return is filed, a copy of the Guarantors' updated personal financial statement; and

(f)    promptly after knowledge thereof shall have come to the attention of the Borrower, written notice of any threatened or pending litigation or governmental proceeding against the Borrower which, if adversely determined, would adversely effect the financial condition or the Property of the Borrower or of the occurrence of any Default or Event of Default hereunder.

Section 8.5.    *Borrowings and Guaranties.*  The Borrower shall not issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money, or be or become liable as endorser, guarantor, surety or otherwise for any debt, obligation or undertaking of any other Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another, or subordinate any claim or demand it may have to the claim or demand of any other Person; *provided, however,* that the foregoing shall not restrict nor operate to prevent:

(a)    the Obligations of the Borrower owing to the Bank under the Loan Documents and other indebtedness and obligations of the Borrower owing to the Bank;

(b)    the Hedging Liability;

-19-

(c)    endorsement of items for deposit or collection of commercial paper received in the ordinary course of business;

(d)    unsecured indebtedness of the Borrower not otherwise permitted by this Section in an amount not to exceed $250,000 in the aggregate at any one time outstanding.

Section 8.6.    *Liens.* The Borrower shall not create, incur or permit to exist any Lien of any kind on any Collateral; *provided, however,* that the foregoing shall not apply to nor operate to prevent:

(a)    easements, rights-of-way, restrictions and other similar encumbrances against real property incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not materially detract from the value of the Property subject thereto;

(b)    mechanics' lien claims asserted against the Residential Property so long as the same are being contested by the Borrower diligently and in good faith and the Borrower has furnished the Title Company with such security or indemnity as the Title Company requires in order to insure the Bank over and against such contested lien; and

(c)    the Liens granted in favor of the Bank pursuant to the Collateral Documents.

Section 8.7.    *Compliance with Laws.* The Borrower shall comply in all respects with the requirements of all federal, state and local laws, rules, regulations, ordinances and orders applicable to or pertaining to its Property, where any such non-compliance, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or result in a Lien upon any of its Property.

Section 8.8.    *Completion.* Subject to any delays occasioned by strikes, lock-outs, acts of God, inability to obtain labor or materials, governmental restrictions, and similar causes beyond the reasonable control of the Borrower, the Borrower will cause the construction of the improvements on the Residential Property to be (i) performed diligently and in a good and workmanlike manner in accordance with sound building and construction practices, applicable governmental requirements and the requirements of this Agreement and (ii) substantially completed on or before the Completion Date free and clear of all Liens or claims for Liens for material supplied or labor or services furnished in connection with such construction unless the Borrower is contesting such Lien or Liens diligently and in good faith and the Borrower has furnished the Title Company with such security or indemnity as the Title Company requires in order to insure the Bank over and against such contested lien.

Section 8.9.    *ERISA.* The Borrower will not maintain or contribute to any Plan or any Multiemployer Plan.

-20-

Section 8.10. *Use of Loan Proceeds*. The Borrower shall use the credit extended under this Agreement solely for the purposes set forth in, or otherwise permitted by, Section 6.4 hereof.

SECTION 9.    EVENTS OF DEFAULT AND REMEDIES.

Section 9.1. *Events of Default*. Any one or more of the following shall constitute an *"Event of Default"* hereunder:

(a)    default for more than three Business Days in the payment when due of all or any part of any Obligation or Hedging Liability payable by the Borrower hereunder or under any other Loan Document (whether at the stated maturity thereof or at any other time provided for in this Agreement), or default shall occur in the payment when due of any other indebtedness or obligation (whether direct, contingent or otherwise) of the Borrower owing to the Bank; or

(b)    default in the observance or performance of any covenant set forth in Sections 8.4, 8.6, 8.7 or 8.8 hereof or of any provision of any Loan Document dealing with the use or remittance of proceeds of Collateral; or

(c)    default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within 30 days after the earlier of (i) the date on which such failure shall first become known to the manager or any other officer of the Borrower or (ii) written notice thereof is given to the Borrower by the Bank; or

(d)    any representation or warranty made by the Borrower herein or in any other Loan Document, or in any statement or certificate furnished by it pursuant hereto or thereto, or in connection with any Loan made hereunder, proves untrue in any material respect as of the date of the issuance or making thereof; or

(e)    any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect, or any of the Loan Documents is declared to be null and void, or any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of the Bank in any Collateral purported to be covered thereby except as expressly permitted by the terms thereof; or

(f)    default shall occur under any Indebtedness for Borrowed Money issued, assumed or guaranteed by the Borrower aggregating more than $100,000, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by lapse of time, acceleration or otherwise); or

-21-

(g) any judgment or judgments, writ or writs, or warrant or warrants of attachment, or any similar process or processes in an aggregate amount in excess of $100,000 shall be entered or filed against the Borrower or either Guarantor or against any of their respective Properties and which remains unvacated, unbonded, unstayed or unsatisfied for a period of 60 days; or

(h) either Guarantor shall purport to disavow, revoke, repudiate or terminate the Guaranty; or

(i) the Guarantors shall at any time issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money or any guarantees thereof (including the contingent obligations of the Guarantors under the Guaranty) in excess of $20,000,000; or

(j) the Borrower and Sebastian Holdings shall at any time fail to maintain direct ownership of Unencumbered Liquid Assets of at least $10,000,000 in the aggregate; or

(k) the Guarantors shall at any time and for any reason cease to own 100% of the equity interest in the Borrower or in Sebastian Holdings;

(l) the Borrower or any Guarantor shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to, or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 9.1(m) hereof; or

(m) a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for the Borrower, any Guarantor or any substantial part of any of their respective Properties, or a proceeding described in Section 9.1(l)(v) shall be instituted against the Borrower or any Guarantor, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 60 days.

*Section 9.2.    Non-Bankruptcy Defaults.*  When any Event of Default described in subsection (a) through (k), both inclusive, of Section 9.1 has occurred and is continuing, the Bank may, by notice to the Borrower, take one or more of the following actions:

(a)    terminate the obligation of the Bank to extend any further credit hereunder on the date (which may be the date thereof) stated in such notice;

(b)    declare the principal of and the accrued interest on the Note to be forthwith due and payable and thereupon the Note, including both principal and interest and all fees, charges and other Obligations payable hereunder and under the other Loan Documents, shall be and become immediately due and payable without further demand, presentment, protest or notice of any kind; and

(c)    enforce any and all rights and remedies available to it under the Loan Documents or applicable law.

*Section 9.3.    Bankruptcy Defaults.*    When any Event of Default described in subsection (l) or (m) of Section 9.1 has occurred and is continuing, then the Note, including both principal and interest, and all fees, charges and other Obligations payable hereunder and under the other Loan Documents, shall immediately become due and payable without presentment, demand, protest or notice of any kind, and the obligation of the Bank to extend further credit pursuant to any of the terms hereof shall immediately terminate.  In addition, the Bank may exercise any and all remedies available to it under the Loan Documents or applicable law.

SECTION 10.    MISCELLANEOUS.

*Section 10.1.    Non-Business Days.*    If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable.  In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

*Section 10.2.    No Waiver, Cumulative Remedies.*    No delay or failure on the part of the Bank or on the part of the holder of the Obligations in the exercise of any power or right shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right.  The rights and remedies hereunder of the Bank and of the holder of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

*Section 10.3.    Amendments, Etc.*    No amendment, modification, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Bank.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

*Section 10.4.    Costs and Expenses; Indemnification.*    The Borrower agrees to pay on demand the costs and expenses of the Bank in connection with the negotiation, preparation,

-23-

execution and delivery of this Agreement, the other Loan Documents and the other instruments and documents to be delivered hereunder or thereunder, and in connection with the recording or filing of any of the foregoing, and in connection with the transactions contemplated hereby or thereby, and in connection with any consents hereunder or waivers or amendments hereto or thereto, including the reasonable fees and expenses of Chapman and Cutler LLP, counsel for the Bank, actually incurred by the Bank with respect to all of the foregoing (whether or not the transactions contemplated hereby are consummated). In addition, at the time of requesting any amendment hereof or consent or waiver hereunder, the Borrower must negotiate with the Bank a reasonable fee to the Bank for engaging in and documenting any such action. The Borrower further agrees to pay to the Bank or any other holder of the Obligations or any Hedging Liability all costs and expenses (including court costs and attorneys' fees), if any, incurred or paid by the Bank or any other holder of the Obligations or Hedging Liability in connection with any Default or Event of Default or in connection with the enforcement of this Agreement or any of the other Loan Documents (including, without limitation, any indemnification or similar costs incurred by the Bank under any account control agreements, acknowledgments of pledge or any other agreements executed in connection with the Collateral Documents) or any other instrument or document delivered hereunder or thereunder. The Borrower further agrees to indemnify the Bank, and any security trustee, and their respective directors, officers and employees, against all losses, claims, damages, penalties, judgments, liabilities and expenses (including, without limitation, all expenses of litigation or preparation therefor, whether or not the indemnified Person is a party thereto) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any Loan, other than those which arise from the gross negligence or willful misconduct of the party claiming indemnification. The Borrower, upon demand by the Bank at any time, shall reimburse the Bank for any reasonable legal or other expenses actually incurred in connection with investigating or defending against any of the foregoing except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified. The obligations of the Borrower under this Section shall survive the termination of this Agreement.

Section 10.5. *Documentary Taxes.* The Borrower agrees to pay on demand any documentary, stamp or similar taxes payable in respect of this Agreement or any other Loan Document, including interest and penalties, in the event any such taxes are assessed, irrespective of when such assessment is made and whether or not any credit is then in use or available hereunder.

Section 10.6. *Survival of Representations.* All representations and warranties made herein or in any of the other Loan Documents or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

Section 10.7. *Survival of Indemnities.* All indemnities and other provisions relative to reimbursement to the Bank of amounts sufficient to protect the yield of the Bank with respect to the Term Loan, including, but not limited to, Sections 2.7 and 2.8 hereof, shall survive the

-24-

termination of this Agreement and the payment of the Note and shall expire after a period of one year in which no claim is made under such indemnities and reimbursement provisions.

Section 10.8. *Notices.* Except as otherwise specified herein, all notices hereunder shall be in writing (including, without limitation, notice by telecopy) and shall be given to the relevant party at its address or telecopier number set forth below, or such other address or telecopier number as such party may hereafter specify by notice to the other given by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt. Notices hereunder shall be addressed:

<table>
<tr><td>to the Borrower at:</td><td>to the Bank at:</td></tr>
<tr><td>Barkston Properties, LLC</td><td>Harris N.A.</td></tr>
<tr><td>c/o MyCFO</td><td>111 West Monroe Street</td></tr>
<tr><td>3348 Peachtree Road NE, Suite 500</td><td>Chicago, Illinois 60603</td></tr>
<tr><td>Atlanta, Georgia 30326</td><td>Attention: David W. Hanni (6 West)</td></tr>
<tr><td>Attention: Susan Tillery</td><td>Telephone: (312) 461-2065</td></tr>
<tr><td>Telephone: (404) 806-2815</td><td>Telecopy: (312) 765-8166</td></tr>
<tr><td>Telecopy: (404) 806-2850</td><td></td></tr>
</table>

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, five days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section; provided that any notice given pursuant to Section 1 or Section 2 hereof shall be effective only upon receipt.

Section 10.9. *Construction.* NOTHING CONTAINED HEREIN SHALL BE DEEMED OR CONSTRUED TO PERMIT ANY ACT OR OMISSION WHICH IS PROHIBITED BY THE TERMS OF ANY OF THE OTHER LOAN DOCUMENTS, THE COVENANTS AND AGREEMENTS CONTAINED HEREIN BEING IN ADDITION TO AND NOT IN SUBSTITUTION FOR THE COVENANTS AND AGREEMENTS CONTAINED IN THE OTHER LOAN DOCUMENTS.

Section 10.10. *Headings.* Section headings used in this Agreement are for convenience of reference only and are not a part of this Agreement for any other purpose.

Section 10.11. *Severability of Provisions.* Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 10.12. *Counterparts.* This Agreement may be executed in any number of counterparts, and by different parties hereto on separate counterpart signature pages, and all such counterparts taken together shall be deemed to constitute one and the same instrument.

*Section 10.13. Binding Nature, Governing Law, Etc.* This Agreement shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Bank and the benefit of its successors and assigns, including any subsequent holder of the Obligations. The Borrower may not assign its rights hereunder without the written consent of the Bank. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby. THIS AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

*Section 10.14. Submission to Jurisdiction; Waiver of Jury Trial.* The Borrower hereby submits to the nonexclusive jurisdiction of the United States District Court for the Northern District of Illinois and of any Illinois State court sitting in the City of Chicago for purposes of all legal proceedings arising out of or relating to this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby. The Borrower irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. THE BORROWER AND THE BANK HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

*Section 10.15. Confidentiality.* The Bank agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors to the extent any such Person has a need to know such Information (it being understood that the Persons to whom such disclosure is made will first be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (f) with the prior written consent of the Borrower, or (g) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Bank on a non-confidential basis from a source other than the Borrower or any Guarantor or any of their members, directors, officers, employees or agents, including accountants, legal counsel and other advisors. For purposes of this Section, *"Information"* means all information received from the Borrower or any Guarantor or from any other Person on behalf of the Borrower or any Guarantor relating to the Borrower or any Guarantor, other than any such information that is available to the Bank on a non-confidential

-26-

basis prior to disclosure by the Borrower or any Guarantor or from any other Person on behalf of the Borrower or any Guarantor.

[SIGNATURE PAGE TO FOLLOW]

Upon your acceptance hereof in the manner hereinafter set forth, this Agreement shall constitute a contract between us for the uses and purposes hereinabove set forth.

Dated as of this 24 day of October, 2006.

BARKSTON PROPERTIES, LLC

By _____

Name: Charles B. Rice, Sr.

Title: Manager

Accepted and agreed to at Chicago, Illinois as of the day and year last above written.

HARRIS N.A.

By _____

Name: David W. Hanni

Title: Vice President

-28-

## TERM LOAN NOTE

$9,400,000                                              October **24** , 2006

For value received, the undersigned, Barkston Properties, LLC, a Georgia limited liability company (the *"Borrower"*), hereby promises to pay to the order of Harris N.A. (the *"Bank"*) at its main office at 111 West Monroe Street, Chicago, Illinois, the principal sum of the lesser of Nine Million Four Hundred Thousand and 00/100 Dollars ($9,400,000.00) and the aggregate principal balance of the Term Loan advanced to the Borrower by the Bank under the Commitment provided for in the Term Loan Agreement hereafter mentioned, payable in principal installments in the amounts and at the times set forth in Section 1.1 of the Term Loan Agreement hereinafter mentioned, with a final installment of all principal not sooner paid due and payable on the Maturity Date.

This Note evidences the Term Loan made to the Borrower by the Bank under that certain Term Loan Agreement dated as of even date herewith between the Borrower and the Bank (said Term Loan Agreement, as the same may be amended, modified or restated from time to time, being referred to herein as the *"Term Loan Agreement"*), and the Borrower hereby promises to pay interest at the office described above on such Term Loan evidenced hereby at the rates and at the times and in the manner specified therefor in the Term Loan Agreement.

This Note is issued by the Borrower under the terms and provisions of the Term Loan Agreement and is secured by, among other things, the Collateral Documents, and this Note and the holder hereof are entitled to all of the benefits and security provided for thereby or referred to therein, to which reference is hereby made for a statement thereof. This Note may be declared to be, or be and become, due prior to its expressed maturity and voluntary prepayments may be made hereon, all in the events, on the terms and with the effects provided in the Term Loan Agreement. All capitalized terms used herein without definition shall have the same meanings herein as such terms are defined in the Term Loan Agreement.

The Borrower hereby promises to pay all costs and expenses (including attorneys' fees) suffered or incurred by the holder hereof in collecting this Note or enforcing any rights in any collateral therefor. The Borrower hereby waives presentment for payment and demand. THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF ILLINOIS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

BARKSTON PROPERTIES, LLC

By

Name: Charles B. Rice, Sr.
Title: Manager

2112373.01.02-B.doc
1626738/LAC

GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "*Guaranty*") is made as of this 24 day of October, 2006, by and among each of the parties who have executed this Guaranty (collectively the "*Guarantors*" and individually a "*Guarantor*") in favor of the Guaranteed Creditors hereinafter mentioned and defined.

WITNESSETH:

WHEREAS, the Guarantors are members of Barkston Properties, LLC, a Georgia limited liability company (the "*Borrower*"); and

WHEREAS, the Borrower and Harris N.A., a national banking association (the "*Bank*") have entered into a Term Loan Agreement dated as of even date herewith (such Term Loan Agreement, as the same may be amended or modified from time to time, including amendments and restatements thereof in its entirety, being hereinafter referred to as the "*Loan Agreement*") pursuant to which the Bank has agreed, subject to certain terms and conditions, to extend credit and make certain other financial accommodations available to the Borrower; and

WHEREAS, the Borrower may from time to time be liable to the Bank and/or its affiliates with respect to Hedging Liability (the Bank, together with affiliates of the Bank to whom Hedging Liability may be owed, being hereinafter referred to collectively as the "*Guaranteed Creditors*" and individually as a "*Guaranteed Creditor*"); and

WHEREAS, each Guarantor will directly and substantially benefit from credit and other financial accommodations extended and to be extended by the Guaranteed Creditors to the Borrower pursuant to the Loan Agreement.

NOW, THEREFORE, FOR VALUE RECEIVED, and in consideration of advances made or to be made, or credit accommodations given or to be given pursuant to the Loan Agreement, to the Borrower by the Guaranteed Creditors from time to time, each Guarantor hereby agrees as follows:

1.     The Guarantors hereby jointly and severally guarantee to the Guaranteed Creditors, the full and prompt payment when due (whether by lapse of time, acceleration, or otherwise) of (a) all indebtedness, obligations, and liabilities of the Borrower to the Guaranteed Creditors, and to any of them individually, under or in connection with or evidenced by the Loan Agreement or any other Loan Document, including, without limitation, all obligations evidenced by the Note of the Borrowers issued under the Loan Agreement and all indebtedness, obligations, and liabilities of the Borrower with respect to Hedging Liability as provide in the Loan Agreement, in each case whether now existing or hereafter arising (whether arising before or after the filing of a petition in bankruptcy and including, without limitation, all post-petition interest and fees in a bankruptcy or other similar proceeding, whether or not allowed), due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired and (b) all expenses

and charges, legal or otherwise, actually incurred by the Guaranteed Creditors, and by any of them individually, in collecting or enforcing any of such indebtedness, obligations, and liabilities or in realizing on or protecting or preserving any security or guarantees therefore. The indebtedness, obligations and liabilities described in the immediately preceding clauses (a) and (b) are hereinafter referred to as the *"Guaranteed Indebtedness"*.

2.   The Guarantors further jointly and severally agree to pay all costs and expenses, legal and/or otherwise (including court costs and reasonable attorneys' fees), actually incurred by the Guaranteed Creditors in enforcing or endeavoring to enforce this Guaranty, in enforcing or endeavoring to collect the Guaranteed Indebtedness, or any part thereof, and in protecting, defending or enforcing this Guaranty in any litigation, bankruptcy or insolvency proceedings or otherwise.

3.   Each Guarantor agrees that, upon demand, such Guarantor will then pay to the Guaranteed Creditors the full amount of the Guaranteed Indebtedness, whether or not any one or more of the other Guarantors shall then or thereafter pay any amount whatsoever in respect to their obligations hereunder.

4.   Each of the Guarantors agrees that such Guarantor will not exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to such Guarantor against any person liable for payment of the Guaranteed Indebtedness, or as to any security therefor, unless and until the full amount owing to the Guaranteed Creditors of the Guaranteed Indebtedness, has been paid and all commitments, if any, of the Bank to extend credit to or for the account of the Borrower shall have terminated. The payment by any Guarantor of any amount or amounts to the Guaranteed Creditors pursuant hereto shall not in any way entitle any such Guarantor, either at law, in equity or otherwise, to any right, title or interest (whether by way of subrogation or otherwise) in and to the Guaranteed Indebtedness or any part thereof or any collateral security therefor or any other rights or remedies in any way relating thereto or in and to any amounts theretofore, then or thereafter paid or applicable to the payment thereof howsoever such payment may be made and from whatsoever source such payment may be derived unless and until all of the Guaranteed Indebtedness and all costs and expenses suffered or incurred by said Guaranteed Creditors in enforcing this Guaranty have been paid in full and all commitments of the Bank to extend credit to or for the account of the Borrower shall have terminated and unless and until such payment in full and termination, any payments made by any Guarantor hereunder and any other payments from whatsoever source derived on account of or applicable to the Guaranteed Indebtedness or any part thereof shall be held and taken to be merely payments in gross to the Guaranteed Creditors reducing pro tanto the Guaranteed Indebtedness.

5.   The Guaranteed Creditors may, without any notice whatsoever to any one, sell, assign, or transfer all of the Guaranteed Indebtedness, or any part thereof, or grant participations therein, and in that event each and every immediate and successive assignee, transferee, or holder of or participant in all or any part of the Guaranteed Indebtedness, shall have the right to enforce this Guaranty, by suit or otherwise, for the benefit of such assignee, transferee, holder or participant, as fully as if such assignee, transferee, holder or participant were herein by name specifically given such rights, powers and benefits; but the Bank shall have an unimpaired right

-2-

to enforce this Guaranty for the benefit of the Guaranteed Creditors or any such participant, as to so much of the Guaranteed Indebtedness that it has not sold, assigned or transferred. The Bank will endeavor to provide the Guarantors notice of any such sale, assignment, transfer or grant of a participation but the failure to do so shall in no way affect the liability of the Guarantors hereunder.

6.    This Guaranty is a continuing, absolute and unconditional Guaranty, and shall remain in full force and effect until written notice of its discontinuance executed by the Borrower and all the Guarantors shall be actually received by the Bank, and also until any and all of said Guaranteed Indebtedness created or existing before receipt of such notice shall be fully paid and all commitments of the Bank to extend credit to or for the account of the Borrower shall have terminated. The death of any of the Guarantors shall not terminate this Guaranty until notice of such death shall have been actually received by the Bank, nor until all of said Guaranteed Indebtedness, created or existing or committed to be extended in each case before receipt of such notice shall be fully paid. The Bank may at any time or from time to time release any Guarantor from its obligations hereunder or effect any compromise with any Guarantor and no such release or compromise shall in any manner effect or impair the obligations hereunder of the other Guarantors.

7.    In case of the death, incompetency, dissolution, liquidation or insolvency (howsoever evidenced) of, or the institution of bankruptcy or receivership proceedings against the Borrower or any of the Guarantors, all of the Guaranteed Indebtedness which is then existing shall, at the option of the Bank, immediately become due or accrued and payable from the Guarantors. All dividends or other payments received from the Borrower or on account of the Guaranteed Indebtedness from whatsoever source, shall be taken and applied as payment in gross, and this Guaranty shall apply to and secure any ultimate balance that shall remain owing to the Guaranteed Creditors.

8.    The liability hereunder shall in no wise be affected or impaired by (and the Guaranteed Creditors are hereby expressly authorized to make from time to time, without notice to anyone), any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or other disposition of any of said Guaranteed Indebtedness, either express or implied, or of any contract or contracts evidencing any thereof, or of any security or collateral therefor or any guaranty thereof; the Bank will endeavor to provide the Guarantors notice of any such actions but the failure to do so shall in no way affect the liability of the Guarantors hereunder. The liability hereunder shall in no wise be affected or impaired by any acceptance by the Guaranteed Creditors of any security for or other guarantors upon any of said Guaranteed Indebtedness, or by any failure, neglect or omission on the part of the Guaranteed Creditors to realize upon or protect any of said Guaranteed Indebtedness, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, creditors or property of the Borrower possessed by the Guaranteed Creditors toward the liquidation of said Guaranteed Indebtedness, or by any application of payments or credits thereon. The Guaranteed Creditors shall have the exclusive right to determine how, when and what application of payments and credits, if any, shall be made on said Guaranteed Indebtedness, or any part of same. In order to hold any Guarantor liable hereunder, there shall be no obligation on the part of the Guaranteed Creditors at any time to

-3-

resort for payment to the Borrower or to any other Guarantor, or to any other person or corporations, their properties or estate, or resort to any collateral, security, property, liens or other rights or remedies whatsoever, and the Guaranteed Creditors shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or steps are pending seeking resort to or realization upon or from any of the foregoing are pending.

9.    The Guarantors hereby covenant and agree with the Bank as follows:

(a)    the Guarantors shall, along with Sebastian Investment Holdings, LLC, at all times maintain direct ownership of Unencumbered Liquid Assets of at least $10,000,000 in the aggregate;

(b)    the Guarantors shall not issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money or any guarantees thereof (including the obligations of the Guarantors hereunder) in excess of $20,000,000;

(c)    the Guarantors will deliver to the Bank, as soon as available, and in any event not later than 30 days after being filed with the Internal Revenue Service, a complete copy of the Guarantors' federal income tax return (including all Form K-1s and Schedules) for the immediately preceding year; and

(d)    the Guarantors will deliver to the Bank, as soon as available, and in any event not later than April 30 of each year or 15 days after the Guarantors' federal income tax return is filed, a copy of the Guarantors' updated personal financial statement.

10.    All diligence in collection or protection, and all presentment, demand, protest and/or notice, as to any and everyone, whether or not the Borrower or the Guarantors or others, of dishonor and of default and of non-payment and of the creation and existence of any and all of said Guaranteed Indebtedness, and of any security and collateral therefor, and of the acceptance of this Guaranty, and of any and all extensions of credit and indulgence hereunder, are expressly waived. Notwithstanding the foregoing, however, the Bank agrees to provide the Guarantors with at least five days' prior notice of the Bank's intent to enforce its rights against Guarantors under this Guaranty and the reasons therefor.

11.    No act of commission or omission of any kind (except for acts of gross negligence or willful misconduct), or at any time, upon the part of the Guaranteed Creditors in respect to any matter whatsoever, shall in any way affect or impair this Guaranty.

12.    The Guarantors waive any and all defenses, claims and discharges of the Borrower, or any other obligor, pertaining to the Guaranteed Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Guarantors will not assert, plead or enforce against the Guaranteed Creditors any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statue of frauds, antideficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Borrower or any other person liable in respect of any of the Guaranteed Indebtedness, or any set-off available against the Guaranteed Creditors to the Borrower or any such other person,

-4-

whether or not on account of a related transaction. The Guarantors agree that the Guarantors shall be and remain jointly and severally liable for any deficiency remaining after foreclosure of any mortgage or security interest securing the Guaranteed Indebtedness, whether or not the liability of the Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision.

13.    If any payment applied by the Guaranteed Creditors to the Guaranteed Indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of the Borrower or any other obligor), the Guaranteed Indebtedness to which such payment was applied shall for the purposes of this Guaranty be deemed to have continued in existence, notwithstanding such application, and this Guaranty shall be enforceable as to such of the Guaranteed Indebtedness as fully as if such application had never been made.

14.    The liability of the Guarantors under this Guaranty is in addition to and shall be cumulative with all other liabilities of the Guarantors after the date hereof to the Guaranteed Creditors as a Guarantor of the Guaranteed Indebtedness, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

15.    Any invalidity or unenforceability of any provision or application of this Guaranty shall not affect other lawful provisions and applications hereof, and to this end the provisions of this Guaranty are declared to be severable. Without limiting the generality of the foregoing, any invalidity or unenforceability against any Guarantor of any provision or application of the Guaranty shall not affect the validity or enforceability of the provisions or application of this Guaranty as against the other Guarantors.

16.    Any demand for payment on this Guaranty or any other notice required or desired to be given hereunder to any Guarantor shall be in writing (including, without limitation, notice by telecopy) and shall be given to the relevant party at its address or telecopier number set forth on the appropriate signature page hereof, or such other address or telecopier number as such party may hereafter specify by notice to the Bank given by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt. Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, five days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section.

17.    All capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Loan Agreement.

18.    THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE OF ILLINOIS (without regard to principles of conflicts of laws) in which state it shall be performed by the Guarantors and may not be waived, amended, released or otherwise

-5-

changed except by a writing signed by the Bank. This Guaranty shall be binding upon the Guarantors and upon the heirs, legal representatives, successors and assigns of the Guarantors, and shall inure to the benefit of the Guaranteed Creditors, their successors, legal representatives and assigns. The Guarantors waive notice of the Bank's acceptance hereof. This Guaranty may be executed in counterparts and by different parties hereto on separate counterpart signature pages, each of which shall be an original, but all together to be one and the same instrument.

19.    Each Guarantor hereby submits to the nonexclusive jurisdiction of the United States District Court for the Northern District of Illinois and of any Illinois State court sitting in the City of Chicago for purposes of all legal proceedings arising out of or relating to this Guaranty or the transactions contemplated hereby. Each Guarantor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such court has been brought in an inconvenient forum. EACH GUARANTOR AND THE GUARANTEED CREDITORS HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the Guarantors have caused this Guaranty to be executed and delivered as of the date first above written.

"GUARANTORS"

Charles B. Rice, Sr., individually

Address:

c/o MyCFO
Attn: Allan J. Zachariah
3348 Peachtree Rd. NE, Suite 500
Atlanta, Georgia 30326
Telephone:     (404) 806-2841
Facsimile:     (404) 806-2850

Catherine B. Rice, individually

Address:

c/o MyCFO
Attn: Allan J. Zachariah
3348 Peachtree Rd. NE, Suite 500
Atlanta, Georgia 30326
Telephone:     (404) 806-2841
Facsimile:     (404) 806-2850

-7-

Accepted and agreed to as of the date first above written.

HARRIS N.A.

By _David W. Hanni_

Name  DAVID W. HANNI

Title  VICE PRESIDENT

Address:

111 West Monroe Street
Chicago, IL  60603
Attention:  David W. Hanni
Telephone:    (312) 461-2065
Telecopy:     (312) 765-8166

## IMPORTANT NOTICE TO GUARANTORS

You are being asked to guarantee this debt, as well as all future debts of the debtor entered into with the bank under the Loan Agreement.  Think carefully before you do.  If the debtor doesn't pay the debt, you will have to.  Be sure you can afford to pay if you have to, and that you want to accept this responsibility.  You may also have to pay late fees or collection costs, which increase this amount.

The bank can collect this debt from you without first trying to collect from the debtor. The bank can use the same collection methods against you that can be used against the debtor, such as suing you, garnishing your wages, etc.  If this debt is ever in default, that fact may become part of your credit record.

This notice is not the contract that makes you liable for the debt.

-8-

# EXHIBIT C



EDWARDS WILDMAN PALMER LLP
225 WEST WACKER DRIVE, SUITE 3000
CHICAGO IL 60606
+1 312 201 2000 main  +1 312 201 2555 fax
edwardswildman.com

August 26, 2014

**VIA E-MAIL AND OVERNIGHT MAIL**

*jsullivan@chapman.com*

LSREF3 Sapphire, LLC
c/o James P. Sullivan, Esq.
Chapman and Cutler LLP
111 W. Monroe
Chicago, IL 60603

Re:    *Notice of Sale of Additional Collateral Pursuant to Barkston Forbearance Agreement*

Dear Jim:

Pursuant to Paragraphs 8 and 13 of the Second Forbearance Agreement among and between Barkston Properties, LLC, ("Barkston"), Charles B. Rice, Sr. and Catherine B. Rice (the "Rices") and BMO Harris Bank, N.A. ("BMO"), dated as of January 31, 2012 (the "Forbearance Agreement"), notice ( "Notice") is hereby given to LSREF3 Sapphire, LLC, which claims to be the successor to BMO ("Sapphire" or the "Bank"), that the Rices intend to exercise their rights under Paragraph 8 of the Agreement to proceed with the sale (the "Sale") of the house and lot number (46) Surfsong Road, tracts 34 and 42, block 1, Vanderhorst Beach (425) subdivision of Kiawah Island, South Carolina (the "Property")—all pursuant to that certain Kiawah Island Real Estate Resale Home Contract dated August 6, 2014, by and between the Rices and Island Life Investments, LLC (the "Contract"). I have enclosed copies of the Forbearance Agreement and the Contract for ease of reference.

All defined terms in this Notice shall have the meanings provided herein; and, if no meaning is provided in this Notice for a defined term, such term shall have the meaning provided in the Forbearance Agreement and related documents.

The Agreement expressly provides in Paragraph 8 for the sale of one, more or all of the properties comprising the Additional Collateral by the owner(s) of such Additional Collateral. Indeed, paragraph 8 of the Agreement is entitled "Sale of Additional Collateral." Paragraph 8 further provides that the Borrower and/or the Rices must pay the Bank 90% of the Net Sales Proceeds. Paragraph 8 also requires that the Bank ratably apply those Net Sales Proceeds "to the balance then due under the Loan Documents and the balance then due under the loan documents between Ringo's Ridge, LLC and the Bank."

AM 36638427 5



EDWARDS WILDMAN PALMER LLP
225 WEST WACKER DRIVE, SUITE 3000
CHICAGO, IL 60606
+1 312 201 2000 main +1 312 201 2555 fax
edwardswildman.com

James P. Sullivan, Esq.
August 26, 2014
Page 2

The Rices intend to and will advise the Bank in writing from time to time as the facts and dollar amounts become known related to the closing of the Sale of the Property provided under the Contract, as well as the development and computation of the Net Sales Proceeds owing in connection with such Sale. We will forward you a draft closing statement as soon as one is available, so that you can review and approve the anticipated closing expenses in accordance with ¶8 of the Forbearance Agreement.

Pursuant to this Notice and the Forbearance Agreement, the Rices will pay the Bank 90% of the Net Sales Proceeds in connection with the closing of the Sale contemplated by the Contract. The Bank therefore must release its lien on the Property in conjunction with the closing of the Contract, so as to permit and facilitate the closing of the transaction provided for in the Contract. Upon receipt of the Net Sales Proceeds, the Bank will have an obligation to apply such Net Sales Proceeds to the "balance then due under the Loan Documents and the balance then due under the loan documents between Ringo's Ridge, LLC and the Bank", all pursuant to Paragraph 8 of the Agreement.

As a courtesy, and not because of any obligation to do so—whether under the Forbearance Agreement or otherwise, the Rices are attaching a copy of a current appraisal for the Property dated August 11, 2014. The appraisal values the Property at $4,950,000. The Contract provides a purchase price for the Property of $5.2 million, subject to closing prorations and other terms. This Contract purchase price is well above the appraised fair market value, and represents the only offer received on the Property following over ten years of marketing by real estate brokers.

By this Notice, we confirm the Rices' intention to proceed with the Sale of the Property pursuant to the Contract. It is our understanding that the buyer is now willing, ready and able to close. The Rices are not seeking approval of or consent to the Contract or of the sale itself –as the Forbearance Agreement imposes no such obligation.



EDWARDS WILDMAN PALMER LLP
225 WEST WACKER DRIVE, SUITE 3000
CHICAGO, IL 60606
+1 312 201 2000 main +1 312 201 2555 fax
edwardswildman.com

James P. Sullivan, Esq.
August 26, 2014
Page 3

Please confirm at your earliest opportunity that the Bank will comply with its obligation to facilitate the transaction provided under the Contract. The Rices reserve all rights and remedies under the Forbearance Agreement and applicable law.

Sincerely,

Jonathan W. Young
Attorney for Charles and Catherine Rice

JWY/kag
Attachments

AM 36638427.5

———

KIAWAH ISLAND REAL ESTATE
RESALE HOME CONTRACT
"AS IS" CONDITION

THIS CONTRACT IS SUBJECT TO ARBITRATION UNDER SOUTH CAROLINA'S UNIFORM ARBITRATION ACT, S.C. CODE ANN. SECTIONS 15-48-10 ET SEQ.

PURCHASER:     Island Life Investments LLC
               18 Byfield Lane
               Greenwich, CT 06830

               (hereinafter called the "Purchaser" with address for notice purposes)

SELLER:        Charles B. Rice, Sr. and Catherine B. Rice
               9110 Barkston Drive
               Alpharetta, GA 30022-1046

               (hereinafter called the "Seller" with address for notice purposes)

AGENT:         Kiawah Island Res. Estate, LLC
               P.O. Box 12007
               Charleston, SC 29422
               (hereinafter called "KIRE")

THIS RESALE HOME CONTRACT (this "Contract") being submitted this 6th of August, 2014, by KIRE to the Purchaser shall become binding upon the parties hereto on the date of acceptance by the Seller as provided on the last page hereof.

WHEREAS, the Seller has appointed KIRE as its duly authorized agent for the sale of the Property described in Section 1 below by a duly executed Listing Agreement; and

WHEREAS, the Purchaser desires to purchase the Property under the terms and conditions of this Contract;

NOW, THEREFORE, in consideration of Five and no/100 Dollars ($5.00) and the mutual promises contained in this Contract, the Seller and the Purchaser agree as follows:

WITNESSETH

1. THE PROPERTY. The Seller agrees to sell and the Purchaser agrees to buy, subject to prior sale before receipt by KIRE of this Contract properly executed by both parties hereto and the Downpayment as provided herein, the following described Property: House and Lot Number 460 Surfsong Road, Tract 34 & 42, Block 1, Vanderhorst Beach (42S) Subdivision, being Charleston County TMS #264-14-00-049 (the "Property"), and shown on a plat by Coastal Surveying Co., Inc. dated the 6th day of April, 1977 having lot(s) revision dated 5th day of April, 1979, and recorded in Plat Book AN, at Page 19, in the R.M.C. Office the Charleston County, South Carolina, (the "RMC Office") and incorporated herein by reference (here matter called the "Plat").

INITIALS: Purchaser [____] Purchaser [____] Seller [CBR] Seller [CBR] I HAVE READ THIS PAGE

1

2. PAYMENT. The Purchaser agrees to pay as the full purchase price of the Property the total sum of Five Million Two Hundred Thousand and No/100 ($5,200,000.00) Dollars (the "Purchase Price"), payable as follows:

(a) The sum of Two Hundred Sixty Thousand and No/100 (to be placed upon ratification)($260,000.00) Dollars on the date hereof as a binder.

(b) The sum of --- ($---) Dollars shall be paid on or before the ---day of ---, 20---, as an additional deposit.

(c) The foregoing binder and additional deposit are hereinafter collectively referred to as the "Downpayment". The Downpayment shall be held in the escrow account of KIRE. In accordance with South Carolina Real Estate License Law, disclosure is hereby given that KIRE's escrow account is a non interest bearing account.

(d) The balance of the Purchase Price at Closing as follows: Four Million Nine Hundred Forty Thousand and No/100 ($4,940,000.00) DOLLARS SHALL BE DUE AND PAYABLE BY WIRE TRANSFER AT CLOSING.

3. TITLE. Seller shall convey to Purchaser in fee simple a good and marketable title to the Property, together with any and all easements and other property interests incidental or appurtenant thereto, and be clear of all liens and encumbrances with the exception of the lien of Charleston County taxes for the current year. The Property shall be conveyed subject to (a) any easements shown on the subject Plat, (b) the general easements, equitable restrictions, limitations on use and affirmative obligations to pay charges all as specified in covenants and restrictions recorded in the RMC Office (hereinafter called the "Covenants"); and (c) any other applicable covenants as hereinafter referred to, provided the same do not make the Property unmarketable. The deed of conveyance shall contain covenants of general warranty. Seller shall give possession to Purchaser on the day and at the time of Closing, subject to any outstanding rentals that cannot be relocated by the rental agent, if any, in the normal course of business.

4. CLOSING COSTS AND OTHER FEES. Each party hereto shall pay those closing costs as customarily paid by sellers and purchasers of real property in Charleston County, South Carolina. Seller shall be responsible for the payment of the deed recording fee currently in the amount of $3.70 per $1,000 of consideration, which is required pursuant to Sections 12-24-10 through 12-24-150 of the South Carolina Code of Laws, 1976, as amended. Purchaser shall be responsible for the payment at Closing of the Kiawah Island Community Association Capital Reserve Contribution which is equal to (i) one year's annual general assessment on the Property, OR (ii) .50% (.0050) of the Purchase Price, whichever is greater.

5. TAXES AND ASSESSMENTS. Property taxes, assessments, affirmative obligations to pay maintenance, security and other appropriate charges are to be prorated between Seller and Purchaser at the time of Closing.

6. FINANCING. This Contract is not contingent on Purchaser's ability to obtain financing for not less than ___% of the Purchase Price less the assigned value of the furnishings.

(a) If this Contract is contingent upon Purchaser obtaining financing, Purchaser agrees to immediately apply for such financing. This contingency is waived unless Purchaser notifies Seller by ___, in writing that financing has not been obtained or has been denied. Should Purchaser give said notice to Seller, the parties agree to execute a written release of the other from this Contract and an agreement to hold KIRE harmless, whereupon this Contract shall be null and void, and the Downpayment shall be promptly returned to the Purchaser by KIRE.

7. ASSESSMENTS FOR COMMUNITY SERVICES. As more fully provided in the recorded Covenants, the Purchaser is required to pay assessments to the Kiawah Island Community Association, Inc., which may in each instance be increased as provided in the Covenants, as follows:

Annual General Assessment (2014)
Unimproved Property             $721.00
Improved Property                1,442.00

Annual Segment Assessment (2014 - Second Security Gate)

INITIALS: Purchaser [ OR ] Purchaser [ _____ ] Seller [ CB ] Seller [ BH ] HAVE READ THIS PAGE

2

Unimproved Property  
Improved Property

Annual Annuity Assessment (2014) (Prorated among Parties)  
Unimproved Property      65.00  
Improved Property      124.00

Supplemental Annual Assessment for 2014  
Unimproved Property      130.00  
Improved Property      200.00

**8. RIGHT OF REPURCHASE.** THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURSUANT TO ARTICLE II, PARAGRAPH 2 OF THE KIAWAH GENERAL COVENANTS RECORDED IN BOOK K119, PAGE 406 IN THE RMC OFFICE, AS AMENDED, IN THE EVENT THE PURCHASER DESIRES TO SELL THE PROPERTY IT SHALL BE OFFERED FOR SALE TO KIAWAH RESORT ASSOCIATES, LP (KRA LP) FOR THE SAME PRICE AT WHICH THE HIGHEST BONAFIDE OFFER HAS BEEN MADE FOR THE PROPERTY AND ACCEPTED BY SELLER, AND KRA LP SHALL HAVE THIRTY (30) DAYS WITHIN WHICH TO EXERCISE ITS OPTION TO PURCHASE THE PROPERTY AT THIS PRICE. SHOULD KRA LP FAIL OR REFUSE WITHIN THIRTY (30) DAYS AFTER RECEIPT OF WRITTEN NOTICE OF THE PRICE AND TERMS, TO EXERCISE ITS OPTION TO PURCHASE THE PROPERTY AT THE OFFERED PRICE THEN THE PURCHASER SHALL HAVE THE RIGHT TO SELL THE PROPERTY SUBJECT TO ALL COVENANTS, RESTRICTIONS, LIMITATIONS, AND AFFIRMATIVE OBLIGATIONS CONTAINED IN THIS CONTRACT AND OF RECORD. NOTHING CONTAINED IN THIS PARAGRAPH SHALL BE CONSTRUED TO IMPAIR THE RIGHT OF FORECLOSURE OF A MORTGAGE ON THE PROPERTY. THIS PROVISION SHALL SURVIVE THE CLOSING HEREUNDER.

**9. DEFAULTS**

(a)      In the event of a default in the performance of any obligations of Purchaser pursuant to this Contract except as amended in Section 6 hereof, Seller (a) shall be released from any further obligations to Purchaser in respect to this Contract and shall be entitled to (b) the remedy of specific performance whereby the Purchaser shall be required to perform, or (c) Seller shall be entitled to retain the Downpayment as agreed liquidated damages, being the intention and agreement of the parties given that the amount of such Downpayment shall act as a fair measure of compensation for actual damages incurred by Seller as a result of Purchaser's said default. In the event Seller shall ensure specific performance, the Downpayment shall apply to the Purchase Price and Purchaser shall be responsible for the payment of reasonable attorney's fees and Actual Cost Incurred by Seller incident to any suit to specific performance against Purchaser resulting from such default.

(b)      In the event of a default in the performance of any of the obligations of Seller pursuant to this Contract, Purchaser shall be entitled (a) to terminate this Contract and receive a refund of any Downpayment; provided, however, that no termination of this Contract by Purchaser shall be effective until written notice thereof has been delivered to Seller and Purchaser shall not be entitled to terminate this Contract on account of any default of Seller which has been cured, or (b) subject to the exclusion set forth below, Purchaser shall enforce specific performance, whereby Seller shall be required to perform. In the event Purchaser shall require specific performance, the Downpayment shall apply to the Purchase Price and Seller shall be responsible for the payment of reasonable attorney's fees and Actual Cost Incurred by Purchaser incident to any suit for specific performance against Seller resulting from such default.

(c)      "Actual Cost Incurred" shall include all reasonable expenses incurred or originated by Purchaser, Seller or KRE in an effort to consummate this sale. Such costs shall include but are not limited to the cost of credit report, appraisal, survey, copy costs and other inspections and reports.

(d)      If this Contract is terminated, both parties shall execute a written release of the other from this Contract which will stipulate the disposition of the Downpayment and be agreement to hold KRE harmless.

**10. CONDITION OF PROPERTY; INSURANCE.**

INITIALS: Purchaser [ ] Purchaser [ ]      [Seller [ ] Seller [ ] HAVE READ THIS PAGE